1

2

3                                    FILED

4                              OCT 2 5 2007

5

6                          CLERK, U.S. DISTRICT COURT
                           CENTRAL DISTRICT OF CALIFORNIA
7                          SOUTHERN DIVISION AT SANTA ANA
                           BY

8               UNITED STATES DISTRICT COURT

9         FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                October 2005 Grand Jury

11  UNITED STATES OF AMERICA,      )  SA CR 06-224
                                   )
12             Plaintiff,          )  F I R S T
                                   )  S U P E R S E D I N G
13        v.                       )  I N D I C T M E N T
                                   )
14  MICHAEL S. CARONA,             )  [18 U.S.C. § 371: Conspiracy;
    DEBRA VICTORIA HOFFMAN,        )  18 U.S.C. §§ 1341 and 1346: Mail
15   a/k/a Debra Victoria Schroff,)  Fraud Depriving the Public of the
     a/k/a Debra Hoffman Schroff,  )  Right of Honest Services of a
16  and DEBORAH CARONA,            )  Public Official; 18 U.S.C. §
                                   )  1512(b): Witness Tampering;
17             Defendants.         )  18 U.S.C. § 152(3): False
                                   )  Statement In Bankruptcy;
18                                 )  18 U.S.C. § 152(1): Fraudulent
                                   )  Concealment of Property In
19                                 )  Bankruptcy; 18 U.S.C. § 2: Aiding
                                   )  and Abetting]
20                                 )
                                   )  [UNDER SEAL]
21  _____    )

22

23  The Grand Jury charges:

24  I.     **INTRODUCTION**

25  At all times relevant to this Indictment:

26       1.   Defendant MICHAEL S. CARONA ("CARONA") was the elected

27  Sheriff-Coroner ("Sheriff") of County of Orange, State of

28  BAS:bas

1  California.  Defendant CARONA was first elected Sheriff
2  by the citizens of Orange County on or about June 2, 1998, and
3  was re-elected Sheriff in 2002 and 2006.  As the Sheriff,
4  defendant CARONA was the chief law enforcement officer of Orange
5  County.  Defendant CARONA also served as the Chairman of the
6  California Council on Criminal Justice ("CCCJ").
7      2.    Defendant DEBRA VICTORIA HOFFMAN ("HOFFMAN"), also
8  known as "Debra Victoria Schroff" and "Debra Hoffman Schroff,"
9  was the long-time mistress of defendant CARONA and an attorney
10 licensed to practice in the State of California.  Defendant
11 HOFFMAN was a partner at the law firm of Jaramillo, Hoffman and
12 Associates ("JHA").  Defendant HOFFMAN also served as a member of
13 the CCCJ and the State Advisory Group on Juvenile Justice
14 Delinquency Prevention ("SAG-JJDP").
15     3.    Defendant DEBORAH CARONA was the wife of defendant
16 CARONA.  At the request of defendant CARONA, the Governor
17 appointed defendant DEBORAH CARONA to the Board of Directors for
18 the 32nd District Agricultural Association, also known as the
19 Orange County Fair Board of Directors.
20     4.    Defendant CARONA named co-conspirator Jaramillo the
21 Assistant Sheriff for Operations and Chief of Staff of the Orange
22 County Sheriff's Department.  Co-conspirator Jaramillo was the
23 Assistant Sheriff from in or about January 1999 until on or about
24 March 17, 2004.  Co-conspirator Jaramillo further was a member of
25 SAG-JJDP and a partner at the JHA law firm.
26     5.    Co-conspirator Donald Haidl ("Haidl") was a successful
27 Orange County businessman who owned and operated automobile
28 auction businesses, including Nationwide Auction Systems (later

sold to Entrade, Inc., a publicly-traded corporation).   Defendant
CARONA appointed co-conspirator Haidl as the Assistant Sheriff
for Reserves of the Orange County Sheriff's Department, a
position co-conspirator Haidl maintained from in or about January
1999 through in or about February 2005.

6.   Co-conspirator J.G.C. was a licensed California attorney
who specialized in criminal defense and personal injury work. Co-
conspirator J.G.C. was a long-time personal friend of defendant
CARONA.   Starting in or about December 1999, co-conspirator
J.G.C. took over the legal practice at JHA, while maintaining his
own legal practice and office.

7.   The Orange County Sheriff's Department was a law
enforcement agency that received in excess of $10,000 annually
pursuant to Federal programs involving grants, contracts, loans,
guarantees, and other forms of Federal assistance within the
meaning of 18 U.S.C. § 666(b) from 1998 through 2006.

**Duty Of Honest Services/Duty to Disclose**

8.   Section 87100 of the California Government Code
prohibited a public official from making, participating in
making, or in any way attempting to use the official's position
to influence a government decision in which the official knew or
had reason to know the official had a financial interest.   The
purpose of the California financial disclosure laws was to ensure
that public officials perform their duties in an impartial
manner, free from bias caused by their own financial interests or
the financial interests of persons or organizations who have
supported them.
//

9.    California Government Code Sections 87200 and 87203 required that certain public officials, including the Sheriff of Orange County, the Assistant Sheriffs of Orange County, the Chairman and members of the CCCJ, the Orange County Fair Board, and the SAG-JJDP, among others, provide detailed and accurate information regarding their economic interests and sources of income.  Each year, a public official was required by law to file a California Fair Political Practices Commission Form 700 Statement of Economic Interests ("Statement of Economic Interests") covering a twelve-month period.  The Statement of Economic Interests required, under penalty of perjury, the disclosure of all sources of economic interests, including investments, real property, income, loans, business positions, gifts, and travel payments.  The filed Statements of Economic Interests were public records and open for public inspection and reproduction by voters, members of the news media, political opponents, and anyone else seeking truthful information about the relationship between a public official and the nature and source of his or her economic interests.

10.   When first elected as Orange County Sheriff in 1998, and when re-elected in 2002 and 2006, defendant CARONA took an oath to support and defend the Constitution of the United States, and the Constitution of the State of California, and to well and faithfully discharge the duties of his office.  As the elected Sheriff of Orange County, defendant CARONA held a position of trust and confidence, and owed the public a duty of providing honest services.  This duty included an obligation on the part of

1  defendant CARONA to conduct his elected office in an honest,
2  faithful, and disinterested manner, free from self-dealing.
3      11.  As Orange County Sheriff, defendant CARONA owed a duty
4  to truthfully and honestly disclose, under penalty of perjury,
5  his financial interests annually on his Statements of Economic
6  Interests.  As appointed members of various official state
7  boards, groups, and councils, defendant CARONA,  defendant
8  HOFFMAN, and defendant DEBORAH CARONA owed a duty to truthfully
9  and honestly disclose, under penalty of perjury, each of their
10  financial interests annually on a Statement of Economic
11  Interests.
12  **II.  <u>OBJECTS OF THE CONSPIRACY</u>**
13      12.  Beginning on a date unknown to the Grand Jury, but as
14  early as March 1998 and continuing through approximately March
15  2004, in Orange County, within the Central District of
16  California, and elsewhere, defendants CARONA, HOFFMAN, and
17  DEBORAH CARONA, aiding and abetting each other, together with co-
18  conspirators Haidl, Jaramilo, J.G.C., and others both known and
19  unknown to the Grand Jury, did knowingly and intentionally
20  conspire and agree with each other to commit offenses against the
21  United States as follows:
22      (a)  To execute and participate in a scheme and
23  artifice to defraud and deprive the citizens of the County of
24  Orange and the State of California of their intangible right to
25  defendant CARONA's honest services performed free from deceit,
26  fraud, concealment, bias, conflict of interest, and self-dealing,
27  and for the purpose of executing this scheme and artifice and
28  attempting to do so, did knowingly cause to be delivered certain

1  mail matter by United States Mail and private and commercial

2  interstate carriers, in violation of Title 18, United States

3  Code, Sections 1341, 1346, and 2;

4        (b)   To corruptly accept and agree to accept, things of

5  value from others, intending to be influenced or rewarded in

6  connection with business, transactions, and series of

7  transactions of the government involving things of value of

8  $5,000 or more while being an agent of a State or local

9  government and when such government or agency received, in any

10  one year period, benefits in excess of $10,000 under a Federal

11  program in violation of Title 18, United States Code, Section

12  666(a)(1)(B); and

13        (c)   To corruptly give, offer, and agree to give things

14  of value to others, with intent to influence and reward an agent

15  of a State or local government, in connection with business,

16  transactions, and series of transactions of such government or

17  agency involving things of value of $5,000 or more when such

18  State or local government or agency received, in any one year

19  period, benefits in excess of $10,000 under a Federal program in

20  violation of Title 18, United States Code, Section 666(a)(2).

21     13.   The plan and purpose of the conspiracy was for

22  defendant CARONA to become elected Sheriff of Orange County, and

23  for him to corruptly use the office of Sheriff to enrich himself,

24  defendant HOFFMAN, defendant DEBORAH CARONA, co-conspirators

25  Haidl and Jaramillo, and others known and unknown to the Grand

26  Jury.

27  ///

28  ///

III. **MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE**
     **ACCOMPLISHED**

14.   The objects of the conspiracy were accomplished as
follows:

(a)   Defendant CARONA and co-conspirators Haidl and
Jaramillo agreed to use, among other things, illegally reimbursed
campaign contributions to defendant CARONA's 1998 campaign for
Orange County Sheriff in violation of California law in order to
win the election.

(b)   Defendant CARONA and co-conspirator Jaramillo
accepted regular cash payments from co-conspirator Haidl, as well
as gifts, trips, the use of Haidl's yacht and private plane, and
other things of value.

(c)   At the direction of defendant CARONA, co-
conspirator Haidl provided defendant HOFFMAN with, among other
things, payments of money, and other things of value.  Defendant
HOFFMAN used and maintained this money and other things of value
for the benefit of herself and defendant CARONA.

(d)   Defendant CARONA corruptly used his office as
Orange County Sheriff to benefit co-conspirator Haidl, including
the appointment of co-conspirator Haidl to the position of
Assistant Sheriff of Orange County.  Defendant CARONA further
used his office to corruptly benefit Haidl's friends, family, and
business associates, as well as other gift-givers and
contributors.

(e)   In exchange for co-conspirator Haidl's financial
assistance for defendant CARONA's campaign as well as co-
conspirator Haidl's payments, gifts, and loans provided to

1  defendants CARONA and HOFFMAN and others, defendant CARONA

2  provided co-conspirator Haidl with full access to the resources

3  of the Orange County Sheriff's Department and a "Get Out of Jail

4  Free" card, and defendant CARONA otherwise abused his position as

5  Orange County Sheriff to enrich co-conspirator Haidl and co-

6  conspirator Haidl's friends and family.

7          (f)  Defendant CARONA deprived the public of its right

8  to his honest services by concealing and otherwise failing to

9  disclose his acceptance of cash payments, as well as gifts,

10  trips, the use of yachts and private planes, and other things of

11  value for himself, his family, defendant HOFFMAN, and defendant

12  DEBORAH CARONA.

13          (g)  Defendants CARONA, HOFFMAN, and DEBORAH CARONA,

14  aiding and abetting each other, covered-up and concealed their

15  receipt of cash, payments of money, loans, gifts, compensation

16  and other benefits from co-conspirator Haidl and others, as well

17  as their business relationships with co-conspirator Haidl,

18  through the making of false statements, and the concealment and

19  non-disclosure of material facts, in connection with the filing

20  of Statements of Economic Interests and other public documents.

21          (h)  Defendants CARONA, HOFFMAN, and DEBORAH CARONA

22  used the United States mail and private and commercial interstate

23  carriers to facilitate the fraudulent scheme.

24  ///

25  ///

26  ///

27  ///

28  ///

## IV.   **OVERT ACTS**

15.   In furtherance of the conspiracy, and to effect the purposes and objects thereof, defendants CARONA, HOFFMAN, and DEBORAH CARONA along with co-conspirators Haidl, Jaramillo, and J.G.C., and other co-conspirators known and unknown to the Grand Jury, committed or caused to be committed at least one of the following overt acts within the Central District of California and elsewhere:

(1)   In or about 1998, defendant CARONA accepted from co-conspirator Haidl several checks purportedly from different campaign contributors in the amount of approximately $1,000 each (the "Bogus Campaign Contributions").

(2)   In or about 1998, co-conspirator Haidl unlawfully reimbursed the purported contributors for the Bogus Campaign Contributions.

(3)   On or about June 1, 1998, the day before the election for Orange County Sheriff, at the request of defendant CARONA, co-conspirator Haidl provided a $110,000 cashier's check to defendant HOFFMAN and co-conspirator Jaramillo as a loan for the JHA law firm ("J-H Loan").

(4)   In or about June 1998, after defendant CARONA won the election, co-conspirator Haidl provided an all-expenses paid trip to Lake Tahoe for defendants CARONA and DEBORAH CARONA, and co-conspirator Jaramillo and his wife.

(5)   Between approximately July through December 1998, defendant CARONA accepted from co-conspirator Haidl approximately $6,000 in cash for defendant CARONA's personal use and benefit.

(6)   In or about December 1998, defendant CARONA lobbied the Orange County Board of Supervisors to change the county's hiring policies so that co-conspirator Haidl, who was not otherwise qualified under such policies, could be appointed to the position of Assistant Sheriff.

(7)   On or about January 26, 1999, as Sheriff of Orange County, defendant CARONA concealed and failed to disclose on his "Assuming Office/Initial" Statement of Economic Interests cash payments and other benefits co-conspirator Haidl and others had provided to defendant CARONA.

(8)   In or about January 1999, defendant CARONA appointed co-conspirator Haidl to the position of Assistant Sheriff for Reserves of the Orange County Sheriff's Department.

(9)   In or about 1999, defendant CARONA caused certain family members, friends and business associates of co-conspirator Haidl be made Reserve Deputies sworn into the Orange County Sheriff's Department Reserve Program.

(10)   Between approximately January through December 1999, defendant CARONA accepted from conspirator Haidl approximately $12,000 in cash for defendant CARONA's personal use and benefit.

(11)   In or about February 1999, at the direction of co-conspirator Haidl, defendant CARONA and co-conspirator Jaramillo were appointed to a previously non-existent board of directors for C.F.S., a company owned and controlled by Haidl's uncle.

       (12)  In 1999, defendant CARONA and co-conspirator Jaramillo accepted numerous checks from C.F.S. for approximately $1,000 under the false pretense that defendant CARONA and co-conspirator Jaramillo were earning this money for participating on the C.F.S. board.

       (13)  On or about September 18, 1999, defendant CARONA accepted ringside tickets to the Oscar De La Hoya versus Felix Trinidad championship boxing event at the Mandalay Bay Events Center in Las Vegas, Nevada, from R.M., a retired Orange County businessman.

       (14)  On or about October 28, 1999, at the request of defendant CARONA, co-conspirator Haidl provided defendant HOFFMAN with a check in the amount of approximately $10,000.

       (15)  In or about October 1999, defendant CARONA and co-conspirators Haidl and Jaramillo agreed to use their influence as officials of the Orange County Sheriff's Department to refer legal cases, including those involving Sheriff's employees, to co-conspirator J.G.C. and to use the legal fees generated from such cases to enrich themselves and to repay the J-H Loan (the "Referral Agreement").

       (16)  On or about December 14, 1999, at the request of defendant CARONA, co-conspirator Haidl provided defendant HOFFMAN with a check in the amount of approximately $5,000.

       (17)  In or about December 1999, defendant CARONA and co-conspirator Jaramillo accepted from E.G., an Orange County businessman, Mont Blanc pens, each valued at approximately $1,400.

(18)   Between approximately January through December 2000, defendant CARONA accepted from co-conspirator Haidl approximately $12,000 in cash for defendant CARONA's personal use and benefit.

(19)   In or about 2000, defendant DEBORAH CARONA accepted from co-conspirator Haidl a St. John Suit worth approximately $1,500.

(20)   On or about January 5, 2000, defendant CARONA mailed a letter to the Governor's office recommending and advocating that defendant HOFFMAN be appointed to a state board or commission.

(21)   On or about January 12, 2000, defendant HOFFMAN filed Articles of Incorporation with the California Office of the Secretary of State under the name "Bersagliere of Pacoima, Inc." ("Bersagliere").

(22)   On or about February 1, 2000, defendant CARONA purchased a cashier's check for $5,000 made payable to defendant HOFFMAN.

(23)   On or about February 10, 2000, at the request of defendant CARONA, co-conspirator Haidl provided defendant HOFFMAN with a check in the amount of approximately $5,000.

(24)   On or about February 14, 2000, defendant CARONA provided defendant HOFFMAN with a check in the amount of $1,500.

(25)   On or about March 10, 2000, at the request of defendant CARONA, co-conspirator Haidl provided defendant HOFFMAN with a check in the amount of approximately $10,000.

(26)   On or about March 24, 2000, as Sheriff of Orange County, defendant CARONA concealed and failed to disclose on his Annual Year 1999 Statement of Economic Interests cash payments and other benefits co-conspirator Haidl and others had provided to defendant CARONA, as well as defendant CARONA's position as a member of the board of directors of C.F.S.

(27)   In or about April 2000, defendant HOFFMAN opened a brokerage account in the name of Bersagliere.

(28)   On or about April 12, 2000, defendant HOFFMAN filed a Statement by Domestic Stock Corporation with the California Office of the Secretary of State for Bersagliere that listed defendant HOFFMAN as the Chief Executive Officer, Secretary, and Chief Financial Officer, and described the type of business of the corporation as "An Investment Group."

(29)   On or about April 25, 2000, at the request of defendant CARONA, co-conspirator Haidl provided defendant HOFFMAN with a check in the amount of approximately $10,000.

(30)   In or about April 2000, defendant CARONA, co-conspirators Jaramillo and J.G.C. met with two Orange County businessmen who owned a paint-ball business (the "Paint-Ball Business Owners") to discuss defendant CARONA's ability to use his influence to facilitate the acquisition of land for the construction of a paint-ball recreational facility within Orange County (the "Paint-Ball Facility").

(31)   In or about April 2000, co-conspirator J.G.C. communicated to the Paint Ball Business Owners that defendant CARONA would use his influence as Orange County Sheriff to assist

with the Paint-Ball Facility in exchange for tens of thousands of dollars in cash.

(32)   In or about April 2000, the Paint-Ball Business Owners paid approximately $25,000 in cash to co-conspirator J.G.C.

(33)   On or about June 6, 2000, at the request of defendant CARONA, co-conspirator Haidl provided defendant HOFFMAN with a check in the amount of approximately $10,000.

(34)   On or about August 1, 2000, at the request of defendant CARONA, co-conspirator Haidl provided defendant HOFFMAN with a check in the amount of approximately $15,000.

(35)   On or about December 22, 2000, defendant HOFFMAN assumed the position as committee member of the CCCJ after her appointment by the Governor.

(36)   Between approximately January through December 2001, defendant CARONA accepted from co-conspirator Haidl approximately $12,000 in cash for defendant CARONA's personal use and benefit.

(37)   On or about January 10, 2001, as Chairman of CCCJ, defendant CARONA concealed and failed to disclose on his "Assuming Office/Initial" Statement of Economic Interests mailed to Sacramento, California, cash payments and other benefits co-conspirator Haidl and others had provided to defendant CARONA.

(38)   On or about January 21, 2001, as a member of the CCCJ, defendant HOFFMAN concealed and failed to disclose on her "Assuming Office/Initial" Statement of Economic Interests mailed to Sacramento, California, payments, the J-H Loan, and other benefits co-conspirator Haidl had provided to her.

(39)  In or about January 2001, defendant HOFFMAN purchased approximately 3,700 shares of stock in Entrade, Inc. ("Entrade") in her personal brokerage account and her Bersagliere brokerage account.

(40)  In or about January 2001, defendant CARONA purchased approximately 3,300 shares of Entrade Stock in his personal brokerage account.

(41)  On or about March 15, 2001, as a member of the CCCJ, defendant HOFFMAN concealed and failed to disclose on her "Amendment" to her "Assuming Office/Initial" Statement of Economic Interests mailed to Sacramento, California, payments, the J-H Loan, and other benefits co-conspirator Haidl had provided to her, as well as her interest in Bersagliere and Entrade stock.

(42)  On or about March 27, 2001, as Sheriff of Orange County, defendant CARONA concealed and failed to disclose on his Annual Year 2000 Statement of Economic Interests cash payments and other benefits co-conspirator Haidl and others had provided to defendant CARONA and his ownership interest in Entrade stock.

(43)  On or about May 11, 2001, defendant CARONA used his influence as Orange County Sheriff to facilitate the appointment of defendant DEBORAH CARONA to the Board of Directors for the 32nd District Agricultural Association, also known as the Orange County Fair Board of Directors.

(44)  In or about May 2001, pursuant to the Referral Agreement, defendant CARONA recommended to a widow of a deceased Orange County Sheriff's Deputy that the widow use co-conspirator

///

J.G.C. to represent her in a wrongful death suit against a
hospital.

(45)   In or about May 2001, co-conspirator Haidl gave
defendant CARONA a Sea Ray Boat and boat trailer valued at over
approximately $5,000.

(46)   In or about July 2001, defendant CARONA provided
co-conspirator Haidl with a check for approximately $5,150 to
make it falsely appear that defendant CARONA had purchased the
Sea Ray Boat from co-conspirator Haidl.

(47)   In or about July 2001, co-conspirator Haidl
returned approximately $5,000 in cash to defendant CARONA to
reimburse the check defendant CARONA had provided to co-
conspirator Haidl (the "Sea Ray Cash").

(48)   In or about July 2001, defendant DEBORAH CARONA
deposited a portion of the Sea Ray Cash in her personal checking
account.

(49)   On or about July 6, 2001, defendant CARONA used
his discretion to approve a Concealed Carry Weapon ("CCW") Permit
for E.G., even though E.G. had a prior conviction for a concealed
weapon offense.

(50)   On or about September 25, 2001, at the request of
co-conspirator Haidl, defendant CARONA used his influence as
Orange County Sheriff to facilitate the appointment of Haidl's
sister, P.H., to the Orange County Fair Board of Directors.

(51)   On or about November 13, 2001, defendant HOFFMAN
knowingly filed a false bankruptcy petition under Title 11 of the
United States Code, in which she concealed and failed to disclose
financial interests and assets she acquired and held in

connection with the conspiracy, including, but not limited to, financial accounts, interest in Bersagliere, the J-H Loan, and payments of money she received from co-conspirator Haidl from October 1999 through August 2000.

(52)  Between approximately January through July 2002, defendant CARONA accepted from co-conspirator Haidl approximately $6,000 in cash for defendant CARONA's personal use and benefit.

(53)  On or about March 10, 2002, as Sheriff of Orange County, defendant CARONA concealed and failed to disclose on his Annual Year 2001 Statement of Economic Interests cash payments and other benefits co-conspirator Haidl and others had provided to defendant CARONA and his ownership interest in Entrade stock.

(54)  On or about March 20, 2002, as Chairman of CCCJ, defendant CARONA concealed and failed to disclose on his Annual Year 2001 Statement of Economic Interests mailed to Sacramento, California, cash payments and other benefits co-conspirator Haidl and others had provided to defendant CARONA.

(55)  On or about March 25, 2002, as a member of the CCCJ, defendant HOFFMAN concealed and failed to disclose on her Annual Year 2001 Statement of Economic Interests mailed to Sacramento, California, the J-H Loan, and other benefits co-conspirator Haidl had provided to her, as well as her ownership interest in Bersegliere and disposition of Entrade Stock.

(56)  In or about July 2002, with defendant CARONA's knowledge and consent, co-conspirator Jaramillo approached the Orange County District Attorney to recommend that the District ///

Attorney's Office charge co-conspirator Haidl's son as a juvenile
in his criminal rape case.

(57)   In or about October 2002, defendants CARONA and
DEBORAH CARONA accepted luxury box Anaheim Angels's World Series
Tickets from Orange County businessmen.

(58)   In or about December 2002, in connection with the
Referral Agreement, co-conspirator J.G.C. received a settlement
in the wrongful death suit for approximately $340,000 for the
estate of a deceased Orange County Sheriff's Deputy, which was
shared with co-conspirators pursuant to the Referral Agreement.

(59)   On or about December 19, 2002, defendant DEBORAH
CARONA and co-conspirator Jaramillo's wife accepted as gifts from
H.A., a businessman who owned a data mining software company,
yellow gold and diamond Ladies Cartier Watches worth
approximately $15,000 each.

(60)   On or about February 25, 2003, as Chairman of
CCCJ, defendant CARONA concealed and failed to disclose on his
Annual Year 2002 Statement of Economic Interests mailed to
Sacramento, California, cash payments and other benefits co-
conspirator Haidl and others had provided to defendant CARONA, as
well as his ownership of Entrade Stock.

(61)   On or about March 17, 2003, as a member of the
Board of Directors of the 32nd Agricultural District, defendant
DEBORAH CARONA concealed and failed to disclose on her Annual
Year 2002 Statement of Economic Interests mailed to Sacramento,
California, among other things, the $15,000 Ladies Cartier Watch.

///

///

(62)   On or about April 1, 2003, as Sheriff of Orange County, defendant CARONA concealed and failed to disclose on his Annual Year 2002 Statement of Economic Interests cash payments and other benefits co-conspirator Haidl and others had provided to defendant CARONA, as well as his ownership of Entrade Stock.

(63)   On or about April 1, 2003, as a member of the CCCJ, defendant HOFFMAN concealed and failed to disclose on her Annual Year 2002 Statement of Economic Interests mailed to Sacramento, California, the J-H Loan, and other benefits co-conspirator Haidl had provided to her, as well as her ownership interest in Bersagliere.

(64)   On or about October 5, 2003, as a member of the CCCJ, defendant HOFFMAN concealed and failed to disclose on her Annual Year 2002 Statement of Economic Interests mailed to Sacramento, California, the J-H Loan, and other benefits co-conspirator Haidl had provided to her, as well as her ownership interest in Bersagliere.

(65)   In or about October 2003, defendant CARONA and co-conspirator Jaramillo caused co-conspirator Haidl's son to receive preferential treatment from the Orange County Sheriff's Department in connection with a drug offense.

COUNTS TWO THROUGH FIVE

[18 U.S.C. §§ 1341, 1346 and 2]

16.   Paragraphs 1 through 15 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

A.   THE SCHEME TO DEFRAUD

17.   Beginning on a date unknown to the Grand Jury, but as early as in or about March 1998, and continuing through approximately March 2004, in Orange County, within the Central District of California, and elsewhere, defendants CARONA and HOFFMAN, along with Haidl, Jaramillo, J.G.C., and Deborah Carona, together with others both known and unknown to the Grand Jury, aiding and abetting each other, knowingly and with the intent to defraud, did devise, participate in, and execute a scheme and artifice to defraud the citizens of the County of Orange and the State of California of their right to the honest services of defendants CARONA and HOFFMAN, and co-conspirators Haidl, Jaramillo, and Deborah Carona by means of materially false and fraudulent pretenses, representations, and promises, and the non-disclosure and concealment of material facts (the "Honest Services Fraud Scheme").

18.   The Honest Services Fraud Scheme was designed to operate and did operate as described above in paragraphs 14(a) through 14(h) of this Indictment.

///
///
///
///

B.   THE MAILINGS

19.   On or about the dates listed below, within the Central District of California, and elsewhere, defendants CARONA and HOFFMAN, and their co-schemers, aiding and abetting each other, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, knowingly and willfully caused the following mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carriers, according to the directions thereon:

| COUNT | DATE | MAIL MATTER | RECIPIENT |
|---|---|---|---|
| 2 | 02/25/03 | Annual Year 2002 Form 700 Statement of Economic Interests from defendant CARONA in Orange County, CA, as Chairman of the CCCJ | Fair Political Practices Commission, Sacramento, CA |
| 3 | 03/17/03 | Annual Year 2002 Form 700 Statement of Economic Interests from Deborah Carona in Orange County, CA, as a member of the Orange County Fair Board | California Department of Food and Agriculture, Sacramento, CA |
| 4 | 04/01/03 | Annual Year 2002 Form 700 Statement of Economic Interests from defendant HOFFMAN in Orange County, CA, as a member of the CCCJ | Fair Political Practices Commission, Sacramento, CA |
| 5 | 10/05/03 | Amended Annual Year 2002 Form 700 Statement of Economic Interests from Defendant HOFFMAN in Orange County, CA, as a member of the CCCJ | Fair Political Practices Commission, Sacramento, CA |

## COUNT SIX

[18 U.S.C. § 1512(b)(1)]

20.   Paragraphs 1 through 15 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

21.   From on or about March 17, 2004, through on or about August 13, 2007, in Orange County, within the Central District of California, defendant CARONA knowingly and willfully did corruptly persuade and attempt to corruptly persuade Haidl, with intent to influence Haidl to testify falsely, and to prevent him from testifying truthfully, in an official proceeding, before members of a Federal Grand Jury investigating bribery, honest services fraud, and related offenses.

1

## COUNT SEVEN

2

[18 U.S.C. § 1512(b)(2)]

3      22.   Paragraphs 1 through 15 of this Indictment are

4 realleged and incorporated by reference as though fully set forth

5 herein.

6      23.   On or about August 13, 2007, in Orange County, within

7 the Central District of California, defendant CARONA met with

8 Haidl and, in a tape-recorded conversation, defendant CARONA

9 knowingly and willfully, did corruptly persuade and attempt to

10 corruptly persuade Haidl to withhold testimony through, among

11 other ways, the use of false and misleading statements, with

12 intent to cause and induce Haidl to withhold testimony in an

13 official proceeding, before members of a Federal Grand Jury

14 investigating bribery, honest services fraud, and related

15 offenses.

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT EIGHT

### [18 U.S.C. § 152(3)]

24. At all times relevant to this Indictment, defendant DEBRA VICTORIA HOFFMAN, also known as Debra Victoria Schroff, a/k/a Debra Hoffman Schroff ("HOFFMAN"), was a licensed California attorney who worked at the law firm of Jaramillo, Hoffman and Associates and the Law Office of Debra V. Hoffman, both located within the Central District of California. Defendant HOFFMAN was a 49% equity partner in Jaramillo, Hoffman and Associates. While operating Jaramillo, Hoffman and Associates and the Law Office of Debra V. Hoffman, defendant HOFFMAN received income and borrowed money from different sources, and controlled various accounts at different financial institutions.

25. At all times relevant to this Indictment, Bersagliere of Pacoima, Inc. ("Bersagliere") was a company incorporated by defendant HOFFMAN. Defendant HOFFMAN served as Chief Executive Officer, Chief Financial Officer, and registered agent for Bersagliere. Defendant HOFFMAN also controlled a brokerage account at Salomon Smith Barney held in the name of Bersagliere.

26. On or about November 13, 2001, in Orange County, within the Central District of California, defendant HOFFMAN, under penalty of perjury as permitted under Section 1746 of Title 28, United States Code, knowingly and fraudulently made the following false declarations and statements as to material matters in and in relation to a case under Title 11 of the United States Code, namely, In re. Robert Stanley Schroff and Debra Victoria Schroff, Case No. SA 01-19414-JB (the "bankruptcy case"):

24

a.    In form Schedule B, Personal Property, filed as an attachment to the petition in the bankruptcy case, defendant HOFFMAN declared and stated "none" when asked to describe and identify the location of all "checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives." In truth and in fact, as defendant HOFFMAN well knew at the time, this declaration and statement was false in that defendant HOFFMAN possessed, owned, and had control over undisclosed accounts, including the following: (i) Personal checking account at Wells Fargo Bank held in the names of defendant HOFFMAN and her mother; (ii) Business checking account at Wells Fargo Bank held in the name of Law Office of Debra V. Hoffman-Client Trust Account; and (iii) Personal savings and checking accounts at Orange County's Credit Union held in the name of defendant HOFFMAN.

b.    In form Schedule B, Personal Property, filed as an attachment to the petition in the bankruptcy case, defendant HOFFMAN declared "none" when asked to describe and identify the location of all "stock and interests in incorporated and unincorporated businesses." In truth and in fact, as defendant HOFFMAN well knew at the time, this declaration and statement was false in that defendant HOFFMAN was the Chief Executive Officer, Chief Financial Officer, and registered agent for Bersagliere, a company she had incorporated, as well as the owner and sole-proprietor of the Law Office of Debra V. Hoffman.

//

c.    In form Schedule F, Creditors Holding Unsecured Nonpriority Claims, filed as an attachment to the petition in the bankruptcy case, defendant HOFFMAN declared and stated forty-eight creditors and the amount of their claims when asked to list all creditors and provide, among other information, the "Creditor's name and mailing address including zip code," the "Date claim was incurred and consideration for claim," and the "amount of claim."  In truth and in fact, as defendant HOFFMAN well knew at the time, this declaration and statement was false in that defendant HOFFMAN failed to disclose a $110,000 loan to Jaramillo, Hoffman and Associates that had been arranged and funded in 1998 by D.H. using First American Bank.

d.    In form Schedule G, Executory Contracts and Unexpired Leases, filed as an attachment to the petition in the bankruptcy case, defendant HOFFMAN declared and stated "Auto Nation Finance" and "Mercedes Benz Credit" when asked to disclose all leases and contracts and provide the "name and mailing address, including zip code, of other parties to lease or contract" and to provide a "Description of contract or lease and nature of debtor's interest.  State whether lease is for nonresidential real property. . . ."  In truth and in fact, as defendant HOFFMAN well knew at the time, this declaration and statement was false in that defendant HOFFMAN failed to disclose her nonresidential lease at 1621 E. 17th Street, Santa Ana, California.

COUNT NINE

[18 U.S.C. § 152(3)]

27.   The Grand Jury hereby repeats and realleges paragraphs 24 and 25 this Indictment, which are incorporated herein by reference.

28.   On or about November 13, 2001, in Orange County, within the Central District of California, defendant HOFFMAN, under penalty of perjury as permitted under Section 1746 of Title 28, United States Code, knowingly and fraudulently made the following false declarations and statements as to material matters in and in relation to a case under Title 11 of the United States Code, namely, In re. Robert Stanley Schroff and Debra Victoria Schroff, Case No. SA 01-19414-JB (the "bankruptcy case"):

a.   In the Statement of Financial Affairs, item 11, Closed Financial Accounts, filed in the bankruptcy case, defendant HOFFMAN declared and stated "none" when asked to "list all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case."  In truth and in fact, as defendant HOFFMAN well knew at the time, this declaration and statement was false in that defendant HOFFMAN had, within the specified time period, controlled a brokerage account at Salomon Smith Barney held in the name of Bersagliere that defendant HOFFMAN opened in or about March 2000 and closed on or about May 30, 2001.

//

//

27

        b.    In the Statement of Financial Affairs, item 18,
Nature, Location and Name of Business, filed in the bankruptcy
case, defendant HOFFMAN declared and stated "Laguna Canyon
Woodwerks" and "Law Offices of Jaramillo, Hoffman & Associates"
when asked to "list the names, addresses, taxpayer identification
numbers, nature of the businesses, and the beginning and ending
dates of all businesses in which the debtor was an officer,
director, partner, or managing executive of a corporation,
partnership, sole proprietorship, or was a self-employed
professional within the six years immediately preceding the
commencement of this case . . . "  In truth and in fact, as
defendant HOFFMAN well knew at the time, this declaration and
statement was false in that defendant HOFFMAN failed to disclose
other businesses in which she served in the identified positions,
including the Law Office of Debra V. Hoffman and Bersagliere.

<u>COUNT TEN</u>

[18 U.S.C. § 152(1)]

29.  The Grand Jury hereby repeats and realleges paragraphs 24 and 25 of this Indictment, which are incorporated herein by reference.

30.  On or about November 13, 2001, in Orange County, within the Central District of California, defendant HOFFMAN, in connection with a case under under Title 11 of the United States Code, namely, <u>In re. Robert Stanley Schroff and Debra Victoria Schroff</u>, Case No. SA 01-19414-JB, knowingly and fraudulently concealed from creditors and the United States Trustee property belonging to the estate of a debtor, namely, at least $65,000 in payments defendant HOFFMAN had received from D.H. during the period beginning on or about October 28, 1999, and continuing through on or about August 1, 2000.

A TRUE BILL

/s/
_____
Foreperson

_Kenneth B. Julian_
KENNETH B. JULIAN
Assistant United States Attorney
Acting Chief, Santa Ana Branch Office

BRETT A. SAGEL
Assistant United States Attorney