# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL S. CARONA, et al.,<br><br>Defendant. | CASE NO. SA CR 06-224-AG<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS |

Before the Court is the Motion to Suppress Statements ("Motion") brought by Defendant Michael Carona ("Defendant"). Defendant argues that statements from his recorded conversations with Don Haidl in 2007 should be suppressed because the Government violated a California Rule of Professional Conduct to obtain the statements. The Court finds that, although the Government violated a California ethical rule prohibiting *ex parte* contacts, the violation does not justify the extreme remedy of suppression, and DENIES Defendants' Motion.

**BACKGROUND**

In early 2004, the Government began investigating possible corruption involving the Orange County Sheriff's Department. In early 2007, Don Haidl, a former Assistant Sheriff,

signed a cooperation plea agreement with the Government and entered a guilty plea before this Court on March 6, 2007. His guilty plea was taken under seal to facilitate Haidl's cooperation against other suspected individuals.

In 2007, following the cooperation plea agreement, Government attorneys sent Haidl to contact Defendant, then Sheriff of Orange County. At the time, Defendant was represented by attorney Dean Steward, who had informed the Government of his representation. Also at that time, grand jury proceedings concerning Defendant were ongoing.

Haidl met with Defendant on July 7, 2007, and July 15, 2007, secretly recording the meetings. Hoping for more evidence, the Government attorneys arranged to have Haidl meet with and secretly record Defendant one more time, on August 13, 2007. For that meeting, the attorneys prepared and provided Haidl with two bogus "Subpoena Attachments" to use to guide his conversation with Defendant.

During the meetings between Defendant and Haidl, Defendant made statements that could be used to show that he received cash and gifts from Haidl and that he intended to convince Haidl to lie if asked to testify about those matters. Defendant here moves to suppress those statements.

**ANALYSIS**

This Motion focuses on Defendant's claim that California Rule of Professional Conduct 2-100 ("Rule 2-100") was violated, and that this violation requires suppression. The Court finds that under Ninth Circuit case law, the Government overstepped the boundaries of Rule 2-100, but that suppression is not justified.

    **1.    CALIFORNIA RULE OF PROFESSIONAL CONDUCT 2-100**

Rule 2-100 governs communications by lawyers with represented parties. It provides that

1  "[w]hile representing a client, a member [of the State Bar of California] shall not communicate
2  directly or indirectly about the subject matter of the representation with a party the member
3  knows to be represented by another lawyer in the matter, unless the member has the consent of
4  the other lawyer." Under 28 U.S.C. § 530B, known as the McDade Amendment, Rule 2-100
5  applies to government attorneys.

### 1.1 The "Otherwise Authorized by Law" Exception

Rule 2-100 does not forbid communications with a represented defendant that are "otherwise authorized by law." Rule 2-100(C)(3). Communications that are "otherwise authorized by law" include communications made under "the authority of government prosecutors and investigators to conduct criminal investigations, as limited by the relevant decisional law." Rule 2-100, Discussion. The Government argues that Haidl's communications with Defendant Carona were allowable under Rule 2-100 because they were "authorized by law." The Court disagrees.

The parties do not dispute that Haidl acted as an agent of the government when he secretly recorded his conversations with Defendant, and that those conversations occurred before Defendant's indictment in a non-custodial situation. Numerous Ninth Circuit cases have addressed when pre-indictment, non-custodial communications between a government lawyer and a represented defendant are "authorized by law" and thus not subject to Rule 2-100.

In the Ninth Circuit, indirect, pre-indictment, non-custodial communications between a government lawyer and a represented party are generally permitted. For example, in *United States v. Kenny*, 645 F.2d 1323 (9th Cir. 1981), the Ninth Circuit ruled that a secret recording of a telephone conversation between a suspect and a cooperating witness was not obtained in violation of the then applicable ethical rule, which was very similar to Rule 2-100. ABA Code of Professional Responsibility DR 7-104(A)(1). The court found that the secret recording of the pre-indictment, non-custodial conversation did not violate the rule because "the Government's

1  use of such investigative techniques at this stage of a criminal matter does not implicate the sorts
2  of ethical problems addressed by [the rule]." *Kenny*, 645 F.2d at 1339.
3        Likewise, in *United States v. Powe*, 9 F.3d 68, 69 (9th Cir. 1993), the Ninth Circuit found
4  a cooperating witness's secret recording of a conversation to be "authorized by law." Applying
5  Rule 2-100, the court stated that "we have held the duty to avoid ex parte contacts does not apply
6  to preindictment, non-custodial conversations with a suspect." *Id.* at 69, 69 n.4 (quoting *Kenny*,
7  645 F.2d at 1339); *see also United States v. Lemonakis*, 485 F.2d 941, 955-56 (D.C. Cir. 1973)
8  (finding that the "communication" prohibited by the ethical rules "does not in our view embrace
9  the initiation and recording of the conversations between [an informant] and [a defendant]" who
10 is not in custody nor under indictment).

12                 1.1.1   The *Talao* Standard

14       The approach of *Kenny* and *Powe* was tempered by the Ninth Circuit in *United States v.*
15 *Talao*, 222 F.3d 1133 (9th Cir. 2000). The *Talao* court stated that *Kenny* and *Powe* had found
16 "pre-indictment, non-custodial communications by federal prosecutors and investigators with
17 represented parties" to be acceptable only "in particular cases." *Id.* at 1138-39. The court noted
18 that "we have declined to announce a categorical rule excusing all such communications from
19 ethical inquiry." *Id.* at 1139. The court then cited the Second Circuit's decision in *United States*
20 *v. Hammad*, 858 F.2d 834, 839-40 (2d Cir. 1988) as setting forth the "proper" approach: "Rather
21 than announcing a bright-line rule, the [Second Circuit] preferred to apply the ethical rule
22 through 'case-by-case adjudication,' policing clear misconduct while keeping in mind that
23 prosecutors are 'authorized by law' to employ legitimate investigative techniques in conducting
24 or supervising criminal investigations." *Talao*, 222 F.3d at 1139.
25       After emphasizing the importance of the Second Circuit's "case-by-case" approach, the
26 *Talao* court turned to the facts before it. In *Talao*, a corporation's bookkeeper had been
27 subpoenaed to testify before a grand jury investigating the corporation. On the day the
28

4

1 bookkeeper was to testify, she approached the Assistant United States Attorney ("AUSA") in
2 charge of the case and stated that she did not wish to be represented by the corporate attorney.
3 The AUSA informed the bookkeeper of her right to her own attorney, and when the bookkeeper
4 declined representation, the AUSA continued her direct conversation with the bookkeeper. *Id.* at
5 1136.

6 Considering these facts, the *Talao* court found that the direct communication between the
7 AUSA and the bookkeeper was not "authorized by law."

> Here, although at the time of the communications no indictments had yet been issued, the government and [the corporation] had clearly taken adversarial positions. The Department of Labor was conducting its civil investigation of [the corporations's] wage practices. . . . On behalf of [the corporation], attorney Brose had initiated settlement talks with the government regarding both its civil and criminal investigations. Under these circumstances, involving fully defined adversarial roles, impending grand jury proceedings, and awareness on the part of the responsible government actors of [the corporation's] ongoing legal representation, Rule 2-100 governed [the AUSA's] pre-indictment, non-custodial communications with [the defendant].

18 *Id.* at 1139.

19 Defendant argues that this passage from *Talao* sets forth a three-prong standard
20 governing all pre-indictment, non-custodial communications between a government
21 lawyer and a represented defendant. Under this standard, communications would not be
22 "authorized by law" whenever the circumstances involve: (1) fully defined adversarial
23 roles, (2) impending grand jury proceedings, and (3) awareness by the government
24 lawyers that the defendant is represented. Defendant argues that under this standard, the
25 communications in this case were clearly not "authorized by law." Defendant is
26 mistaken. *Talao* involved a *direct* communication between a lawyer and an adverse
27 layperson and did not set forth a three-prong standard governing all pre-indictment, non-
28 custodial communications between a lawyer and a layperson.

1    First, the language of *Talao* does not indicate that the Ninth Circuit wished to set
2 forth a broad standard. To the contrary, *Talao* approved a "case-by-case" analysis and
3 used the limiting language "[u]nder these circumstances" when applying the standard. *Id.*
4 at 1139.

5    Second, *Talao* dealt with a direct contact between a government lawyer and a
6 represented party, which is a very different situation from an indirect, investigative
7 contact. The Ninth Circuit has emphasized that indirect investigative contacts do not
8 "implicate the sorts of ethical problems" that direct contacts by attorneys do. *Kenny*, 645
9 F.2d at 1339. It would not make sense, then, for the Ninth Circuit to set forth a broad
10 standard governing both direct and indirect contacts between a government lawyer and a
11 represented defendant without expressing a clear intent to do so. *See United States v.
12 Ward*, 895 F. Supp. 1000, 1006 (N.D. Ill. 1995) (distinguishing between direct and
13 indirect contacts with represented parties); *United States v. Mohr*, 2007 WL 2344875, *4
14 (D. Or. 2007) (not applying *Talao*'s three prong "standard" to an indirect investigative
15 contact with a represented suspect). Indeed, even *Hammad*, relied on by *Talao*,
16 distinguishes between indirect, investigative contacts and contacts where the government
17 lawyer becomes heavily involved. *Hammad*, 858 F.2d at 838-40.

18    Third, *Talao's* three prongs, if applied to indirect, investigative contacts, would
19 likely have required a reversal of both *Powe* and *Kenny*. In *Kenny*, grand jury
20 proceedings were likely impending at the time of the communication, because Kenny's
21 indictment was returned less than two months after the investigative contact. *Kenny*, 645
22 F.2d at 1337-38. Also, the government had admitted that it was aware that Kenny was
23 represented by counsel at the time of the contact. *Id.* at 1338. Finally, the adversarial
24 roles were fully defined, because one of Kenny's co-conspirators had already been
25 indicted and Kenny was aware that he was being investigated, had discussed that
26 investigation with his co-conspirators, and had obtained counsel to defend him. *Id.* at
27 1337. Similarly, the *Powe* opinion shows that, at the time of the contact between the
28 cooperating witness and Powe, the government was aware that Powe was represented by

counsel and the adversarial roles were fully defined. *Powe*, 9 F.3d at 69-70. The *Talao* court cited both *Powe* and *Kenny*, but did not mention any potential conflict between its holding and the holdings of those cases. This must mean that the *Talao* court did not seek to apply its three prong "standard" to indirect, investigative contacts between a government attorney and a represented party.

Thus, the holding of *Talao*, as applied to indirect, investigative contacts between a government attorney and a represented party, is that the application of Rule 2-100 should be governed by the *Hammad* court's standard of "case-by-case adjudication." Courts evaluating indirect, investigative contacts should "polic[e] clear misconduct while keeping in mind that prosecutors are 'authorized by law' to employ legitimate investigative techniques in conducting or supervising criminal investigations." *Talao*, 222 F.3d at 1139 (quoting *Hammad*, 858 F.2d at 839-840). The focus of this analysis thus turns to *Hammad*.

### 1.1.2   The *Hammad* Standard

In *Hammad*, an AUSA directed a cooperating witness to arrange and secretly record a meeting with a suspect. *Hammad*, 858 F.2d at 835. The cooperating witness was to inform the suspect that he had been subpoenaed to appear before the grand jury investigating the suspect's fraud. To set up the meeting, the AUSA provided the cooperating witness with a sham subpoena to show the suspect. *Id.* at 836. At the secretly recorded meeting, the suspect and the cooperating witness discussed how the cooperating witness could avoid compliance with the subpoena. *Id.* The suspect was later indicted for, among other things, obstructing justice by attempting to influence grand jury testimony. *Id.*

After his indictment, the suspect argued that the sham subpoena and the secretly recorded meeting violated New York's version of Rule 2-100. The *Hammad* court agreed, explaining that the ethical rule could apply to pre-indictment, non-custodial,

7

1 investigatory contacts in certain limited situations. Recognizing that "the use of
2 informants by government prosecutors in a preindictment, non-custodial situation . . . will
3 generally fall within the 'authorized by law' exception," the court found that "in some
4 instances a government prosecutor may overstep the already broad powers of his office,
5 and in so doing, violate the ethical [rule]." *Id.* at 839-840. The court found that where
6 the prosecutor issued a subpoena for an informant, "not to secure his attendance before
7 the grand jury, but to create a pretense that might help the informant elicit admissions
8 from a represented suspect," the prosecutor overstepped the bounds of his office by
9 turning the informant into the "alter ego" of the prosecutor. *Id.*

10 The *Hammad* court understood that the purpose of the ethical rule is "to protect a
11 defendant from the danger of being 'tricked' into giving his case away by opposing
12 counsel's artfully crafted questions." *United States v. Jamil*, 707 F.2d 638, 646 (2nd Cir.
13 1983). Because of this, the *Hammad* court made a distinction between pre-indictment,
14 non-custodial communications between a government lawyer and a represented suspect
15 that are direct, and those that are indirect. The court found that indirect communications
16 are generally allowed because they generally do not subject a layperson to a lawyer's
17 "artfully crafted questions." Indirect communications are *not* allowed, however, when the
18 prosecutor is so involved that the contact becomes essentially a direct one between the
19 suspect and the lawyer, because the cooperating witness has become the "alter ego" of the
20 lawyer. The *Hammad* court concluded that where a government lawyer manufactures a
21 bogus subpoena to guide the investigative contact, the lawyer has become too involved.
22 *Hammad*, 858 F.2d at 839-40.

23 The boundaries set by *Hammad* thus focused on the use of a bogus subpoena,
24 which obviously parallels the facts of this case. The Government attempts to distinguish
25 the fake "Subpoena Attachments" used in this case from the *Hammad* subpoena, arguing
26 that the fake "Subpoena Attachments" did not "employ the seal of the court or a signature
27 of the Clerk, as did the sham subpoenas in *Hammad*." (Opposition 16:21-23.) The Court
28 recognizes that the government attorneys here likely tried their best to adhere to the

*Hammad* standard while aggressively pursuing a suspected criminal. And the Court recognizes the difficulty of practically applying the case law concerning Rule 2-100 to real world situations. But the Government's proposed distinction is a distinction without a difference. The *Hammad* court was concerned that a subpoena was given to the informant "to create a pretense that might help the informant elicit admissions from a represented suspect." *Hammad*, 858 F.2d at 839-40. That is exactly what occurred here with the August 13, 2007, meeting. The government lawyers provided Haidl with the fake "Subpoena Attachments" as a trick to elicit admissions from Defendant. They made efforts to "disguise that these documents were not part of an actual subpoena." (Sagel Declaration ¶ 5.) Finally, they sent the documents with Haidl to "guide his conversation." (Opposition 3:6.) In this circumstance, relating to the August 13, 2007 recording, the *Hammad* standard requires a finding that, because the government attorneys became too involved in manufacturing the contact between Haidl and Defendant, Haidl improperly became the "alter ego" of the prosecutors. *Id.* Some deception in criminal investigations is necessary and proper. But *Hammad* holds that the trickery of a sham official document steps over the line in cases like this. Thus, the conversation between Haidl and Defendant in this case was not "authorized by law."

### 1.2     Application of Rule 2-100

The Government contends that, even if its conduct in this case is not allowed under the "authorized by law" exception," its conduct did not violate the plain language of the rule. The Government points out that Rule 2-100 forbids communication "about the subject matter of the representation" with a party "represented by another lawyer in the matter." The Government argues that "prior to and during the surreptitious recordings, defendant Carona was actively participating in an ongoing attempt to obstruct justice." (Opposition 8:6-11.) "As such, defendant Carona cannot legally or ethically claim to be represented by counsel with respect to his obstructive conduct." (*Id.*) This argument

9

fails.

When sending Haidl to speak to Defendant Carona, the Government thought, but could not be sure, that Defendant Carona was going to suborn perjury during the conversations. Thus, the Government sent in Haidl, equipped with what looked like subpoena documents, to talk to Carona about "the subject matter of the representation" – the Government's investigation into alleged corruption in the Orange County Sheriff's Department. (Opposition 2:11-15.) There is no question that Defendant Carona was represented as to that subject matter. (Opposition 2:15-17.) Thus, regardless of what happened during the conversations, sending Haidl to speak to a party represented by counsel violated Rule 2-100. The Government's argument that the Government's contact with Defendant Carona was proper because Defendant Carona appears to act illegally during the contact is a bootstrapping argument that must fail.

The Government also makes a more basic argument under *Talao*, 222 F.3d at 1140, that the plain language of Rule 2-100 does not prohibit the conduct in this case. In *Talao*, after determining that the "authorized by law" exception to Rule 2-100 did not apply to the actions of the AUSA, the Ninth Circuit found that the language of the rule itself did not prohibit the AUSA's conduct. In that case, as discussed, a represented party approached the AUSA because she felt pressured to lie by the corporate attorney, and she wished to tell the truth.

In the case at hand, to the contrary, the Government approached Defendant Carona, hoping that he would make statements damaging to his case. It is in this circumstance that the protections of Rule 2-100 are most needed. *See United States v. Ryans*, 903 F.2d 731, 739 (10th Cir. 1990) ("The rule appears to be intended 'to protect a defendant from the danger of being 'tricked' into giving his case away by opposing counsel's artfully crafted questions.") (citations omitted); *Continental Insurance Co. v. Superior Court of Los Angeles County*, 32 Cal. App. 4th 94, 112 (1995) ("[O]ne of the reasons for the ethical rule barring ex parte communication is to prevent injurious disclosures."); *Mitton v. State Bar of California*, 71 Cal. 2d 525, 534 (1969) ("If a party's

10

counsel is present when an opposing attorney communicates with a party, counsel can easily correct any element of error in the communication or correct the effect of the communication by calling attention to counteracting elements which may exist.").

Thus, the Government's contact with a represented defendant in this case violated Rule 2-100.

### 2. SUPPRESSION AS THE REMEDY FOR A VIOLATION OF CALIFORNIA RULE OF PROFESSIONAL CONDUCT 2-100

The Government argues that even if government counsel violated Rule 2-100, suppression of the tapes is not an appropriate remedy. According to the Government, "[c]ourts reserve suppression of evidence for the most egregious of Government actions, including Constitutional violations and deliberate violations of law, none of which is present in this case." (Opposition 20:6-9.) The Court agrees.

In the Ninth Circuit, a district court may exercise its supervisory powers to exclude evidence obtained through a violation of Rule 2-100. *Powe*, 9 F.3d at 69; *United States v. Lopez*, 4 F.3d 1455, 1463 (9th Cir. 1993). "There are three legitimate grounds for a court's exercise of supervisory power: 'to implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *Lopez*, 4 F.3d at 1463 (quoting *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)); *United States v. Hasting*, 461 U.S. 499, 505 (1983).

Still, the exclusionary rule is an extreme remedy that "has been restricted to those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348 (1974). This is because "suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case." *United States v. Payner*, 447 U.S. 727, 734 (1980) (citations omitted); *see also Elkins v. United States*, 364 U.S. 206, 216 (1960) ("[A]ny apparent limitation upon

the process of discovering truth in a federal trial ought to be imposed only upon the basis of considerations which outweigh the general need for untrammeled disclosure of competent and relevant evidence in a court of justice."); *United States v. Caceres*, 440 U.S. 741, 754 (1979) ("[The exclusionary] rule has primarily rested on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial.")  Further, a very important point is that suppression of evidence can diminish the public perception of the integrity of our criminal justice system.  *See Offutt v. United States*, 348 U.S. 11, 14 (1954) ("[J]ustice must satisfy the appearance of justice.").

The Court finds suppression cannot be justified in this case.  The potential benefits of suppression here are outweighed by the "considerable harm that would flow from indiscriminate application of an exclusionary rule."  *Payner*, 447 U.S. at 734; *see also Caceres*, 440 U.S. at 754-55 ("In view of our conclusion that none of respondent's constitutional rights has been violated [by a violation of agency regulations], our precedents enforcing the exclusionary rule to deter constitutional violations provide no support for the rule's application in this case.").

Suppression is particularly unwarranted here in the context of Rule 2-100.  The court is aware of no criminal case where a communication with a government agent violating a rule like Rule 2-100 was suppressed, unless the communication also violated the Sixth Amendment.  *See United States v. Bowman*, 277 F. Supp. 2d 1239 (N.D. Ala. 2003) *vacated, United States v. Bowman*, 2003 WL 23272667 (N.D. Ala. Sept. 12, 2003) (suppressing a communication found to violate both an Alabama Rule of Professional Conduct and the Sixth Amendment).  Here, of course, there is no argument that the communication violated the Sixth Amendment.

Further, Rule 2-100 is a weak foundation for suppression because it has proven to be particularly difficult to apply in practice.  See, for example, L.A. County Bar Assn. Formal Opn. 475, which overruled L.A. County Bar Assn. Formal Opn. 465 to establish a

more practical application of Rule 2-100. Indeed, revisions of Rule 2-100 are now being considered, with comments accompanying the new rule appearing to be more forgiving to government investigative activities. *See* Discussion Draft: Proposed Amendments to the Rules of Professional Conduct of the State Bar of California, State Bar of California, Rule 4.2, Comment 19 (2008).

Moreover, there are less extreme remedies than suppression available for violations of California Rules of Professional Conduct. *See Lopez*, 4 F.3d at 1464 (deciding against dismissal of an indictment where less extreme remedies, "such as holding the prosecutor in contempt or referral to the state bar for disciplinary proceedings," were available). The State Bar of California has a very effective system for disciplining and deterring attorney misconduct, spending approximately $43,455,000 on discipline related expenses in 2006. *See* 2006 Report on the State Bar of California Discipline System, State Bar of California (2007).

In this case, where the law governing the application of Rule 2-100 to investigatory contacts is unclear and where less extreme remedies are available, the harm caused by suppression is too high a price to pay.

**DISPOSITION**

Defendant's Motion is DENIED.

IT IS SO ORDERED.

DATED: May 2, 2008

                                                                _____
                                                                Andrew J. Guilford
                                                            United States District Judge