1  THOMAS P. O'BRIEN
   United States Attorney
2  ROBB C. ADKINS
   Assistant United States Attorney
3  Chief, Southern Division
   BRETT A. SAGEL (CBN: 243918)
4  Assistant United States Attorney
   KENNETH B. JULIAN (CBN: 149840)
5  Deputy Chief, Assistant United States Attorney
        Ronald Reagan Federal Building
6       411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
7       Telephone: (714) 338-3598
        Facsimile: (714) 338-3523
8       Email: Brett.Sagel@usdoj.gov

9  Attorneys for Plaintiff
   UNITED STATES OF AMERICA

10

11                UNITED STATES DISTRICT COURT

12           FOR THE CENTRAL DISTRICT OF CALIFORNIA

13                     SOUTHERN DIVISION

14  UNITED STATES OF AMERICA,    ) NO. SA CR 06-224(D)-AG
                                 )
15            Plaintiff,         ) GOVERNMENT'S RESPONSE TO PRE-
                                 ) SENTENCE REPORT AND GOVERNMENT'S
16            v.                 ) POSITION RE: SENTENCING FOR
                                 ) DEFENDANT MICHAEL CARONA
17  MICHAEL S. CARONA,           )
                                 ) Date:      April 27, 2009
18            Defendant.         ) Time:      2:30 p.m.
                                 )
19  ─────────────────────────────)

20       Plaintiff United States of America, by and through its

21  counsel of record, Assistant United States Attorneys Brett A.

22  Sagel and Kenneth B. Julian, hereby submits its Response to the

23  Pre-Sentence Report and the its Position Regarding Sentencing for

24  defendant Michael Carona.  The Government's sentencing position

25  and response is based upon the attached memorandum of points and

26  authorities, the files and records in this case, the Pre-Sentence

27  Report, and such additional evidence or argument as may be

28  presented at the sentencing hearing.

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                   <u>PAGE</u>

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . iii

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**. . . . . . . . . . . . . 2

**I.    <u>INTRODUCTION</u>**. . . . . . . . . . . . . . . . . . . . 2

**II.   <u>FACTUAL BACKGROUND</u>**. . . . . . . . . . . . . . . . . 4

**III.  <u>GUIDELINE CALCULATIONS</u>**. . . . . . . . . . . . . . . 9

        A.   THE GOVERNMENT'S GUIDELINE CALCULATION. . . . . . . 9

        B.   THE APPLICABLE SENTENCING GUIDELINE MANUAL. . . . . 9

        C.   CROSS-REFERENCE PURSUANT TO SECTION 2J1.2 IS
             REQUIRED. . . . . . . . . . . . . . . . . . . . . 10

        D.   USE OF ACQUITTED CONDUCT AT SENTENCING. . . . . . 13

        E.   DEFENDANT'S BASE OFFENSE LEVEL. . . . . . . . . . 15

        F.   SPECIFIC OFFENSE CHARACTERISTICS. . . . . . . . . 15

             1.   <u>The Offense Involved More Than One Bribe</u>
                  <u>(§ 2C1.1(b)(1))</u>. . . . . . . . . . . . . . . 15

             2.   <u>The Value of the Payments and Benefits</u>
                  <u>Received by Defendant (§ 2C1.1(b)(2))</u>. . . . . 16

             3.   <u>The Offense Involved an Elected Public official</u>
                  <u>or Any Public Official in a High-Level</u>
                  <u>Decision-Making Position (§ 2C1.1(b)(3))</u>. . . . 22

             4.   <u>Defendant Was A Public Official Who Facilitated</u>
                  <u>the Obtaining of A Government Identification</u>
                  <u>Document (§ 2C1.1(b)(4)(C))</u>. . . . . . . . . 22

**IV.   <u>RESPONSE TO DEFENDANT'S ANTICIPATED CLAIMS</u>**. . . . . . . 26

        A.   SUSCEPTIBILITY TO ABUSE IN PRISON. . . . . . . . . 27

        B.   DEFENDANT'S PUBLIC SERVICE. . . . . . . . . . . . 29

        C.   REMEDY FOR AUGUST 13, 2007 RECORDING. . . . . . . 29

        D.   DEFENDANT'S FAMILY SITUATION. . . . . . . . . . . 30

**V.    <u>RECOMMENDED SENTENCE</u>**. . . . . . . . . . . . . . . . 31

        A.   AN UPWARD DEPARTURE FOR DISRUPTION OF GOVERNMENTAL
             FUNCTION UNDER USSG § 5K2.7. . . . . . . . . . . . 33

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

    B.    OTHER RELEVANT ADJUSTMENTS. . . . . . . . . . . .   40

          1.   Role in the Offense.. . . . . . . . . . . . .   40

          2.   Abuse of a Position of Trust. . . . . . . . .   40

          3.   Adjustment for Obstruction of Justice.. . . .   42

    C.    A 108-MONTH SENTENCE IS APPROPRIATE.. . . . . . .   44

          1.   Nature and Circumstances of the Offense. . . .   45

          2.   History And Characteristics Of Defendant.. . .   45

          3.   Need For The Sentence to Reflect the Seriousness
              of the Offense, to Promote Respect For the
              Law, and to Provide Just Punishment For the
              Offense. . . . . . . . . . . . . . . . . . .   48

          4.   Need For the Sentence to Afford Adequate
              Deterrence.. . . . . . . . . . . . . . . . .   49

          5.   Need For the Sentence to Protect the Public. .   50

VI.   CONCLUSION.. . . . . . . . . . . . . . . . . . . . .   51

Sentencing Exhibit 1. . . . . . . . . . . . . . . . . . .   52

Sentencing Exhibit 2. . . . . . . . . . . . . . . . . . .   54

Sentencing Exhibit 3. . . . . . . . . . . . . . . . . . .   55

Sentencing Exhibit 4. . . . . . . . . . . . . . . . . . .   59

**TABLE OF AUTHORITIES**

DESCRIPTION                                                          PAGE

FEDERAL CASES:

Schachter v. C.I.R.,
    255 F.3d 1031 (9th Cir. 2001).. . . . . . . . . . . . . 32

United States v. Arias,
    253 F.3d 453 (9th Cir. 2001). . . . . . . . . . . . . passim

United States v. Mark Arneson
    CR 04-1046(E)-DSF, 2009. . . . . . . . . . . . . . . . 35

United States v. Benitez-Perez,
    367 F.3d 1200 (9th Cir. 2004).. . . . . . . . . . . . . 10

United States v. Booker,
    543 U.S. 220 (2005).. . . . . . . . . . . . . . . . passim

United States v. Brenson,
    104 F.3d 1267 (11th Cir. 1997). . . . . . . . . . . . . 12

United States v. Cantrell,
    433 F.3d 1269 (9th Cir. 2006).. . . . . . . . . . . . . 44

United States v. Dare,
    425 F.3d 634 (9th Cir. 2005). . . . . . . . . . . . . . 14

United States v. Dickerson,
    114 F.3d 464 (4th Cir 1997).. . . . . . . . . . . . . . 12

United States v. Foreman,
    926 F.2d 792 (9th Cir. 1990). . . . . . . . . . . . 25, 41

United States v. Gundy,
    112 F.3d 1493 (11th Cir. 1997). . . . . . . . . . . . . 35

United States v. Hopper,
    177 F.3d 824 (9th Cir. 1999). . . . . . . . . . . . . . 14

United States v. Jones,
    260 Fed. Appx. 873(6th Cir. 2008).. . . . . . . . . . 25, 26

United States v. Jordan,
    256 F.3d 922 (9th Cir. 2001).. . . . . . . . . . . . . 14

United States v. Kemp,
    500 F.3d 257 (3d Cir. 2007).. . . . . . . . . . . . . . 20

United States v. Kincaid-Chauncey,
    --- F.3d —, 2009 WL 415567, *14 (9th Cir. 2009) . . . . . 21

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

FEDERAL CASES (Cont'd):

United States v. Koon,
     518 U.S. 81 (1996). . . . . . . . . . . . . . . . . . 27, 28

United States v. McQueen,
     86 F.3d 180 (11th Cir. 1996). . . . . . . . . . . . . . 12

United States v. Mercado,
     474 F.3d 654 (9th Cir. 2007). . . . . . . . . . . . . . 13

United States v. Mondello,
     927 F.2d 1463 (9th Cir. 1991).. . . . . . . . . . . . . 31

United States v. Paulus,
     419 F.3d 693 (7th Cir. 2005). . . . . . . . . . . . . . 35

United States v. Sierra,
     188 F.3d 798 (7th Cir. 1999). . . . . . . . . . . . . . 41

United States v. Staten,
     466 F.3d 708 (9th Cir. 2006). . . . . . . . . . . . . . 14

United States v. Stevens,
     462 F.3d 1169 (9th Cir. 2006).. . . . . . . . . . . . . 10

United States v. Terry Christensen
     CR 04-1046(E)-DSF, 2008. . . . . . . . . . . . . . .  50

United States v. Thames,
     214 F.3d 608 (5th Cir. 2000). . . . . . . . . . . . . . 28

United States v. Walker,
     21 F. Supp. 2d 1288 (N.D. Okla 1997). . . . . . . . . 34, 35

United States v. Watts,
     519 U.S. 148 (1997).. . . . . . . . . . . . . . . . 13, 14

United States v. Weyhrauch,
     548 F.3d 1237 (9th Cir. 2008).. . . . . . . . . . . . . 21

United States v. White,
     270 F.3d 356 (6th Cir. 2001). . . . . . . . . . . . . . 41

STATUES:

18 U.S.C. §§ 1341-1343. . . . . . . . . . . . . . . . .  15

18 U.S.C. § 1512(b)(2). . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3553(a).. . . . . . . . . . . . . . . . . . passim

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

SENTENCING GUIDELINES:

USSG § 1B1.11.. . . . . . . . . . . . . . . . . . . . . . .  10

USSG § 2C1.1. . . . . . . . . . . . . . . . . . . . .  passim

USSG § 2C1.1, App. Note 4.. . . . . . . . . . . . . . . .  22

USSG § 2C1.1(a)(1). . . . . . . . . . . . . . . . . . . . . 9

USSG § 2C1.1(b)(1). . . . . . . . . . . . . . . . . . . 9, 15

USSG § 2C1.1(b)(2). . . . . . . . . . . . . . . . . . . 9, 16

USSG § 2C1.1(b)(3). . . . . . . . . . . . . . . . . . . 9, 22

USSG § 2C1.1(b)(4)(C).. . . . . . . . . . . . . . . 9, 22, 23

USSG § 2J1.2. . . . . . . . . . . . . . . . . . . . . . .  11

USSG § 2J1.2(a).. . . . . . . . . . . . . . . . . . . . .  11

USSG § 2J1.2(b)(2). . . . . . . . . . . . . . . . . . . .  11

USSG § 2J1.2(b)(3)(C).. . . . . . . . . . . . . . . . . .  11

USSG § 2J1.2(c).. . . . . . . . . . . . . . . . . . . . .  10

USSG § 2X3.1(a)(1). . . . . . . . . . . . . . . . . . . 9, 11

USSG § 3B1.3. . . . . . . . . . . . . . . . . . . . . . .  40

USSG § 3C1.1. . . . . . . . . . . . . . . . . . . . . . .  42

USSG § 5E1.2(d).. . . . . . . . . . . . . . . . . . . . .  32

USSG § 5H1.6. . . . . . . . . . . . . . . . . . . . . . .  30

USSG § 5K2.7. . . . . . . . . . . . . . . . . . . . . . .  34

USSG § 6A1.3. . . . . . . . . . . . . . . . . . . . . . .  13

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

On October 25, 2007, a grand jury returned an indictment charging Michael Carona ("defendant"), the sitting-Sheriff of Orange County, with conduct that violated his sworn duties and responsibilities to the citizens of Orange County and the State of California and violated the public's trust in the highest ranking law enforcement official in Orange County.  Defendant's trial commenced on October 28, 2008, and concluded on January 16, 2009.  After deliberating, the jury found defendant guilty on Count Six, witness tampering, involving defendant's attempt to convince Don Haidl ("Haidl") to lie to and withhold testimony from a federal grand jury, in violation of Title 18, United States Code, Section 1512(b)(2).

The Probation Office prepared and disclosed its thorough and well-reasoned Pre-Sentence Report ("PSR") and Sentencing Recommendations on March 20, 2009.  The Probation Office determined that defendant's total offense level is 28 and the criminal history category is I.  (PSR ¶ 110).  Thus, the Probation Office calculated the sentencing range to be 78-97 months imprisonment.  The Probation Office recommended defendant serve a sentence of 78 months, pay a fine of $65,000, and be placed on supervised release for two years.

The Government has no material objections to the factual statements in the PSR or the calculation of criminal history category.  Regarding the Offense Level Calculation, the Government concurs with the Probation Office's finding that

2

Section 2J1.2(c)(1) of the United States Sentencing Guidelines ("Sentencing Guidelines" or "USSG") is applicable, necessitating the application of Section 2X3.1 ("the cross-reference"), which in turn requires the use of 2C1.1 to determine the appropriate guideline calculation.  (PSR ¶¶ 35-37).  The Government further concurs with the Probation Office's calculation of the base offense level (14), the two-level increase for more than one bribe, the fourteen-level increase pursuant to the Section 2B1.1 table, and a four-level increase for the offense involving an elected official/high-ranking official.  (PSR ¶¶ 37-40).  The Government submits, however, that an additional two-level adjustment applies pursuant to Section 2C1.1(b)(4)(C) as defendant was a public official who facilitated the obtaining of a government identification document.

The Government, therefore, submits that the correct total offense level is thirty, with an advisory guideline range of 97-121 months.  The Government recommends a guideline sentence of 108 months imprisonment, approximately the mid-point of this range, which the Government believes is the minimum sentence necessary to provide appropriate general and specific deterrence, to promote respect for the law, to provide just punishment, and to reflect the seriousness of defendant's crimes.[1]  The Government also recommends the imposition of a fine of at least $125,000.

---

[1]As the Court will see from the Sentencing Guideline discussion below, the Government could arguably seek a much greater sentence, however, the Government believes 108 months is appropriate.

1                                    **II.**

2                         **FACTUAL BACKGROUND**

3        This Court presided over numerous hearings in this case and

4   defendant's trial.   The Government will not repeat all the facts

5   and evidence this Court saw and heard during this case.   Rather,

6   the Government provides the following facts for purposes of

7   sentencing, which this Court can determine the Government proved

8   by clear-and-convincing evidence.   Additional facts are also

9   included in the Sentencing Guideline Sections below.

10       On January 16, 2009, after approximately eight weeks of

11  trial, a jury convicted defendant of knowingly and willfully

12  attempting to corruptly persuade Don Haidl to withhold testimony

13  from a federal grand jury investigating defendant's honest

14  services fraud and bribery scheme, in violation of Title 18,

15  United States Code, Section 1512(b)(2).   Although the jury found

16  defendant not guilty of Counts One through Five, the underlying

17  facts of the conspiracy and honest services charges, the

18  investigation of which defendant was attempting to obstruct, are

19  relevant for sentencing, as discussed below, and to establish why

20  defendant was attempting to convince Haidl to lie and withhold

21  evidence from a federal grand jury.

22       By March 2004, defendant was aware of the federal

23  investigation in this case.   On March 17, 2004, defendant fired

24  George Jaramillo ("Jaramillo") based on conflicts and problems

25  between the two of them.   Almost immediately, Jaramillo met with

26  federal investigators to provide evidence regarding defendant's

27  corrupt activities.   Defendant learned of Jaramillo's cooperation

28  and attempted to influence the testimony of others in light of

                                    4

1  Jaramillo's cooperation.   From 2004 through 2006, defendant had

2  numerous meetings and discussions with Haidl regarding what their

3  stories would be and how to conceal their prior activities.

4       In early 2007, Haidl entered his guilty plea before this

5  Court and began cooperating with the Government.   As part of

6  Haidl's cooperation with the Government, Haidl surreptitiously

7  recorded three conversations with defendant on July 7, July 15,

8  and August 13, 2007.   All three meetings were set up by

9  defendant's wife and Haidl's sister as defendant would not use

10 the phone with Haidl for fear the Government was listening to

11 their conversations.   Defendant agreed to the third meeting with

12 Haidl on an emergency basis as defendant believed Haidl had

13 received a federal Grand Jury subpoena.   The surreptitiously

14 recorded meeting on August 13, 2007, formed the basis for Count

15 Six, on which the jury convicted defendant.   This Court heard

16 these recordings at length, which included defendant's admissions

17 of earlier misconduct as well as his numerous attempts to get

18 Haidl to lie and withhold the truth regarding their corrupt

19 activities.   For example:

20     MC:  They'd love to have the Martha Stewart thing of, I
            don't have to prove this.  All I got to do is
21          prove that you lied.  So that's why, when I say I
            don't know --
22     DH:  That's what -- that's what this -- that's set up
            for.
23     MC:  Exactly, Exactly.  But if --
       DH:  **If we have different stories, they're going to** --
24     MC:  **Amen.  Amen.**  And again, I don't know this side of
            it, Don.  So you know, if -- if the way all
25          business is done at Nationwide is -
       DH:  And, my side is cool.
26     MC:  - they take every hundred dollar bill--
       DH:  And they can uh uh -- they can -- they can go
27          through Nationwide for a hundred years.  They
            can't prove beyond the shadow of a doubt what came

28

5

```
1                    from where.  The money was in my safe at home.
                     Nobody knows except you and me.
2         MC:  Right.
          DH:  And George, he -- I don't care if he stands here
3              and says I saw it happen.  As long as you and me
               are on the same page --
4         MC:  The answer is -
          DH:  -- and we say --
5         MC:  - flat-ass didn't fucking happen.  It didn't
               happen.
6

7         (Trial Exhibits 374, 375)(emphasis added).

8         MC:  The other thing that is unique about this
               relationship is they can't get one without the
9              other, and somebody's gonna go first...

10        (Trial Exhibits 376, 377)(emphasis added).

11        MC:  So, I figured I'd be the first one on the stand.
               [UI] and Mark was gonna get everything that I
12             said.  So all you got to do is, here's "A" through
               "Z".  You know, if it's true, it's true.  Just
13             consis . . . consistently stays true.  My sense is
               you're going to be the first on the stand, 'cause
14             I don't think you're the target at all, I think
               I'm the target.  So bottom line is, you know,
15             first person in there is what you say becomes the
               truth.  It's -- it -- it becomes the truth.
16

17        (Trial Exhibits 380, 381)(emphasis added).

18        MC:  I don't know where they go with the, you know,
               going all over your cash contributions to -- I'm
19             sure they're looking for you know, money that went
               to -- to me, went to George, went to Joe.  Again,
20             I don't know the accounting side of that deal, so
               I can't --
21        DH:  On my end, nothings traceable.  It's hidden, it
               all come out of a safe.  They can -- they can fuck
22             around all they want and go back a hundred years.
          MC:  Well, on my end of it --
23        DH:  They cannot put it -- they - it -- it's
               untraceable.  Any cash is untraceable.
24        MC:  Well, on -- on my end of it, completely
               untraceable, completely untraceable.
25
                     *           *           *
26
          MC:  Your answer --
27        DH:  - take me, let's do it.
          MC:  Your answer is my answer.
28        DH:  Okay.

                                6
```

1   (Trial Exhibits 386, 387)(emphasis added).

2   DH:   Yeah.  Cavallo, George, I don't give a shit if
          George was in the room, whatever we did, as long
3         as our stories are straight, I'm okay, as long as
          I know there's no trail anywhere.
4   MC:   **No trail anywhere.**
    DH:   Okay.
5   MC:   Period.
    DH:   Okay.
6   MC:   **Period.  Period.  In fact, not even close to being
          a trail.**

7

8   (Trial Exhibits 392, 393)(emphasis added).

9        On August 13, 2007, as was the case on prior occasions,

10  defendant attempted to convince Haidl to lie and withhold

11  testimony regarding defendant's corrupt behavior dating back to

12  approximately March 1998.  That corrupt behavior was, as

13  established by the evidence at trial, as follows.

14       In early 1998, defendant, then the Marshal of Orange County

15  running to become Sheriff of Orange County in the June 1998

16  election, along with his campaign manager George Jaramillo, met

17  Haidl, a wealthy Orange County businessman.  Defendant and

18  Jaramillo promised Haidl that if Haidl got defendant elected

19  Sheriff, Haidl would have access to the resources of the Orange

20  County Sheriff's Department ("OCSD").  Soon thereafter, defendant

21  began knowingly receiving -- and using -- illegally-reimbursed

22  campaign contributions along with other improper in-kind

23  contributions made by Haidl in connection with the June 1998

24  Sheriff's election.  As a result in part of the illegal campaign

25  contributions, defendant won the election for Sheriff of Orange

26  County in June 1998.

27       Soon after winning the election, defendant announced that he

28  was going to make both Jaramillo and Haidl Assistant Sheriffs.

7

1   On January 4, 1999, defendant, along with Jaramillo and Haidl,
2   were sworn in as Sheriff and Assistant Sheriffs, respectively.

3        Starting in approximately September 1998, after winning the
4   election, but prior to being sworn in, defendant began receiving
5   monthly cash bribes of $1,000 from Haidl.  These cash bribes
6   continued through July 2002.  In addition to the cash bribes,
7   defendant also received other gifts and items of value from
8   Haidl, and directed Haidl to provide loans, payments, and other
9   items of value to Debra Hoffman ("Hoffman"), defendant's
10  girlfriend.  Defendant, however, concealed his receipt of these
11  improper gifts and payments, along with other items of value, by
12  failing to disclose them on his Form 700 Statements of Economic
13  Interests.

14       From at least 1999 through early 2004, defendant used his
15  position as Sheriff to benefit Haidl, by providing Haidl with
16  access to the resources of the OCSD, making Haidl a fully-sworn
17  peace officer without the qualifications for such a position,
18  continuing to employ Haidl as the Assistant Sheriff, and
19  providing beneficial treatment to Haidl's family members.
20  Defendant also used his position and influence as Sheriff of
21  Orange County to benefit himself and other members of defendant's
22  inner circle, by, among other ways: giving OCSD badges to Haidl's
23  friends and family; getting Hoffman on state boards; steering
24  legal cases to Joseph Cavallo ("Cavallo") to pay down a loan to
25  Jaramillo and Hoffman, which defendant negotiated; and providing
26  Hoffman's husband a job at the OCSD.
27  //

28

**III.**

**GUIDELINE CALCULATIONS**

A.   THE GOVERNMENT'S GUIDELINE CALCULATION

As explained in more detail below, the Government submits
that the following guideline calculation applies in the
sentencing of defendant Carona:

Base Offense Level:          14   [USSG § 2C1.1(a)(1)]

More than One Bribe:        +2   [USSG § 2C1.1(b)(1)]

Value Benefits/Payments: +14   [USSG § 2C1.1(b)(2)/2B1.1(b)(1)(H)]

Elected Public Official:    +4   [USSG § 2C1.1(b)(3)]

Government ID Document:    +2   [USSG § 2C1.1(b)(4)(C)]

Accessory Adjustment:        <u>-6</u>   [USSG § 2X3.1(a)(1)]

Total Offense Level:         30[2]

With a criminal history category of I, a total offense level of
30 yields an advisory sentencing range of 97-121 months.  For
reasons discussed below, the Government recommends a sentence of
108 months, approximately the mid-point of this range.

B.   THE APPLICABLE SENTENCING GUIDELINE MANUAL

The Probation Office applied the November 2008 version of
the Sentencing Guidelines as the appropriate Guidelines Manual to
determine defendant's advisory guideline range.   (PSR ¶¶ 31-34).
The Government concurs.   Section 1B1.11 of the Sentencing
Guidelines provides that the sentencing court must use the

---

[2]If this Court declines to apply certain adjustments
recommended by the Probation Office and/or the Government, the
facts and circumstances related to those adjustments and
enhancements are aggravating factors that would warrant either an
upward departure pursuant to Section 5K2.7, as discussed in
Section V.A., <u>infra</u>, or an upward variance in light of Section
3553(a) factors, to arrive at the same sentencing range.

1  Guidelines Manual in effect at the time of sentencing unless

2  there is an ex post facto issue.  USSG § 1B1.11; see also United

3  States v. Benitez-Perez, 367 F.3d 1200, 1205 (9th Cir. 2004).

4      The ex post facto clause requires a court to sentence a

5  defendant under the Guidelines Manual in effect at the time of

6  the offense only if the Guidelines have undergone substantive

7  changes that would disadvantage the defendant.  United States v.

8  Stevens, 462 F.3d 1169, 1170 (9th Cir. 2006).  Here, defendant

9  committed the offense of conviction on August 13, 2007, and

10  because there is no substantive difference between the applicable

11  sections of the 2006 and 2008 Guideline Manuals, the Probation

12  Office correctly applied the manual in effect at time of

13  sentencing.

14  C.   CROSS-REFERENCE PURSUANT TO SECTION 2J1.2 IS REQUIRED

15      The jury found defendant guilty of Title 18, United States

16  Code, Section 1512(b)(2).  The Sentencing Guideline applicable to

17  this offense is Section 2J1.2.  See USSG App. A at 547.

18  Sentencing Guideline Section 2J1.2(c) states: "If the offense

19  involved obstructing the investigation or prosecution of a

20  criminal offense, apply §2X3.1 (Accessory After the Fact) in

21  respect to that criminal offense, if the resulting offense level

22  is greater than that determined above."  USSG § 2J1.2(c).

23  Applying 2J1.2(a) and (b), the offense level would be nineteen,

24  which is less than the offense level if the Court applies the

25  cross-reference.[3]  Pursuant to the Guidelines, therefore, the

26  _____

27      [3]Under any calculation pursuant to Section 2J1.2, the
   offense level would be lower than the calculation pursuant to
28  Section 2X3.1. The Government arrives at offense level nineteen

10

1  Court should apply Section 2X3.1, which provides a base offense
2  level of "six levels lower than the offense level for the
3  underlying offense." USSG § 2X3.1(a)(1); see also USSG §2J1.2
4  Commentary ("Because the conduct covered by this guideline is
5  frequently part of an effort to avoid punishment for an offense
6  that the defendant has committed . . ., [u]se of this cross
7  reference will provide an enhanced offense level when the
8  obstruction is in respect to a particularly serious offense . .
9  .")

10      Application of Section 2X3.1 based on the underlying offense
11  is required even though the jury acquitted defendant of that
12  underlying offense.  In United States v. Arias, 253 F.3d 453 (9th
13  Cir. 2001), the Ninth Circuit addressed the application of the
14  cross-reference to a defendant convicted of witness tampering,
15  but acquitted of the underlying prosecution that defendant
16  attempted to obstruct.  Id. at 454-55.  The Court held that
17  application of the cross-reference is mandatory when the offense
18  involves obstructing the prosecution of a criminal offense.  Id.
19  at 458.  The Court stated "[w]hen a defendant is convicted of
20  tampering with a witness, the offense level for obstruction is
21  driven by the offense level of the crime whose prosecution was
22  obstructed," which is accomplished through the application of the
23  cross-reference in Section 2J1.2(c).  Id.

24  _____

25  through the following calculation:

26  Base Offense Level:          14    [USSG § 2J1.2(a)]
    Substantial Interference:    +3    [USSG § 2J1.2(b)(2)]
27  Extensive in Scope/Planning: +2    [USSG § 2J1.2(b)(3)(C)]
    Total Offense Level:         19
28

The _Arias_ Court further stated:

> [T]he cross reference applies without regard to whether the underlying offense is provable. In some cases, the court may have to determine the offense, or offenses, with respect to which the obstruction occurred. _This determination is a factual one that the sentencing judge will resolve by a preponderance of the evidence._

_Id._ at 455 (_italics_ in original); _see_ _also_ _United States v. Brenson_, 104 F.3d 1267, 1285 (11th Cir. 1997) (cross-reference applies even if defendant is not convicted of underlying conduct because cross-reference "is intended not to treat defendant as having committed the underlying offense, but to weigh the severity of the underlying offense that was the subject of the judicial proceeding sought to be obstructed, impeded or influenced"); _United States v. McQueen_, 86 F.3d 180, 182-183 (11th Cir. 1996) (district court must apply cross-reference provision of Section 2J1.2(c) even to defendant convicted of witness tampering but acquitted of underlying money laundering); _United States v. Dickerson_, 114 F.3d 464, 468-69 (4th Cir 1997) (applying similar cross-reference in Section 2J1.3(c); standard to determine underlying conduct is preponderance of evidence and "underlying offense" does not need to be offense of conviction because otherwise "perjurers would be able to benefit from perjury that successfully persuaded" jury not to convict). The Government has found _no_ cases, in any Circuit, which suggest the cross-reference would not apply simply because the jury acquitted defendant of the underlying conduct.

In this case, this Court must apply the cross-reference as it provides a greater offense level than Section 2J1.2(a) and (b). As _Arias_ and other cases cited above make clear, this

12

greater offense level is applied not to punish defendant for the "underlying offense," of which the jury acquitted him, but as a reflection of the seriousness and severity of the offense of conviction, that is, the sitting Sheriff of Orange County attempting to obstruct a federal grand jury inquiring into his corrupt activities.

D.   USE OF ACQUITTED CONDUCT AT SENTENCING

In accordance with <u>Arias</u>, both the Supreme Court and the Ninth Circuit have determined that  a sentencing court may use acquitted conduct to determine a defendant's appropriate sentence.  In <u>United States v. Watts</u>, 519 U.S. 148 (1997), the Supreme Court stated: "[an] acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." <u>Id.</u> at 155 (internal quotation and citation omitted).  As a result, the Court held:

> [A]n acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof.  The Guidelines state that it is "appropriate" that facts relevant to sentencing be proved by a preponderance of the evidence, USSG § 6A1.3, comment., and we have held that application of the preponderance standard at sentencing generally satisfies due process. . . **We therefore hold that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.**

<u>Id.</u> at 156-57 (internal quotation and citation omitted) (emphasis added); <u>see also</u> <u>United States v. Mercado</u>, 474 F.3d 654, 656-58 (9th Cir. 2007) (holding, in line with "every other Court of Appeals to consider the issue," that <u>Booker</u> does not abrogate

1  <u>Watts</u> and that sentencing courts remain free to rely at

2  sentencing on conduct underlying acquitted criminal charges).

3       Both <u>Watts</u> and <u>Arias</u>, as well as the commentary to USSG

4  Section 6A1.3, state that a sentencing court may consider

5  acquitted conduct in sentencing defendant as long as the conduct

6  is proven by a preponderance of the evidence.  The Ninth Circuit

7  has also confirmed that, even post-<u>Booker</u>, "[a]s a general rule,

8  the preponderance of the evidence standard is the appropriate

9  standard for factual findings used at sentencing." <u>United States</u>

10 <u>v. Dare</u>, 425 F.3d 634, 642 (9th Cir. 2005).  A line of Ninth

11 Circuit cases, however, imply that the Government must prove such

12 conduct by clear-and-convincing evidence.

13      Pre-<u>Booker</u>, the Ninth Circuit held that due process

14 considerations may require that particular facts be established

15 by clear and convincing evidence when these facts have a

16 "disproportionate impact" on the sentence.  <u>United States v.</u>

17 <u>Hopper</u>, 177 F.3d 824, 832-33 (9th Cir. 1999); <u>see</u> <u>also</u> <u>United</u>

18 <u>States v. Jordan</u>, 256 F.3d 922, 928 (9th Cir. 2001) (identifying

19 non-exclusive list of factors for consideration relating to

20 disproportionate effect to determine if clear-and-convincing

21 standard applies).  The Ninth Circuit has held that <u>Hopper</u>

22 remains valid post-<u>Booker</u> and that, accordingly "this circuit's

23 established rule, requiring facts found in support of Guideline

24 enhancements that turn out to have disproportionate impact on the

25 ultimate sentence imposed be established by clear and convincing

26 evidence, continues to govern sentencing decisions." <u>United</u>

27 <u>States v. Staten</u>, 466 F.3d 708, 717-720 (9th Cir. 2006).

28

14

Even assuming the applicability of the higher clear-and-convincing standard, the testimony and evidence presented at trial establish each of the sentencing enhancements or adjustments discussed below.  These adjustments and enhancements apply, therefore, even though defendant was acquitted of the charges in Counts One through Five.

E.   DEFENDANT'S BASE OFFENSE LEVEL

Section 2C1.1 of the Sentencing Guidelines covers offenses pertaining to fraud involving the deprivation of the intangible right to honest services of public officials.  See USSG § 2C1.1 (Heading); USSG § 2C1.1 (Background) ("Section 2C1.1 also applies to fraud involving the deprivation of the intangible right to honest services of government officials under 18 U.S.C. §§ 1341-1343. . .").  The base offense level under Section 2C1.1 is fourteen if defendant was a "public official."  The definition of "public official," in application note one, clearly encompasses defendant's position, that is, Sheriff of Orange County.  Therefore, defendant's base offense level is fourteen.

F.   SPECIFIC OFFENSE CHARACTERISTICS

1.   The Offense Involved More Than One Bribe (§ 2C1.1(b)(1))

Sentencing Guidelines Section 2C1.1(b)(1) provides for a two-level enhancement "[i]f the offense involved more than one bribe . . ."  USSG § 2C1.1(b)(1).  The Government agrees with the Probation Office's inclusion of this adjustment and the rationale stated therein.  (PSR ¶ 38).  The evidence at trial established that Haidl provided $1,000 cash payments to defendant from approximately September 1998 through July 2002, totaling approximately $45,000.  As Haidl described, these payments were

each individual incidents of bribery, <u>not</u> installment payments.
<u>See</u> USSG § 2C1.1 Appl. Note 2.   In addition, Haidl also provided
defendant with the Sea-Ray boat, valued at approximately $5,000,
and on several occasions, at defendant's direction, made loans
and payments to bail out the Jaramillo, Hoffman & Associates
("JHA") Law Firm.   At defendant's request, Haidl also provided
Hoffman with approximately $65,000 in payments.   Haidl provided
all of the payments, gifts, loans, illegal campaign
contributions, among other items, to defendant or to others at
defendant's request and direction, to gain access to the OCSD and
to purchase influence from defendant in his official capacity as
the Sheriff of Orange County.   <u>See</u> Jury Trial, Day 10, Vol. II,
Pp. 84-87.[4]

    2.   <u>The Value of the Payments and Benefits Received by
         Defendant (§ 2C1.1(b)(2))</u>

     Section 2C1.1(b)(2) of the Sentencing Guidelines instructs
the Court to increase defendant's offense level pursuant to the
loss table in Section 2B1.1 for "the value of the payment, the
benefit received . . ., the value of anything obtained or to be
obtained by a public official or others acting with a public
official . . ."   USSG § 2C1.1(b)(2).   The Probation Office
recommends a fourteen-level increase pursuant to Section
2B1.1(b)(1)(H) as defendant received and/or solicited funds

_____

     [4]In addition to the cash payments, the boat, the JHA loans,
and the payments to Hoffman, Haidl also bought defendant custom-
made suits and clothes and provided defendant with free use of
Haidl's yacht and private plane.   Haidl also paid for countless
expenses for defendant and provided a false verification letter
to Hoffman at defendant's direction.   Each of these separate
instances also support the "more than one bribe" enhancement.

exceeding $400,000, but less than $1,000,000. (PSR ¶ 39). The Government concurs with this finding and the rationale contained in the PSR. The following items support the fourteen-level increase:

•   The $1,000 per month cash payments Haidl provided to defendant from approximately September 1998 through July 2002 (**$45,000**).

•   The Sea-Ray Boat that Haidl gave to defendant (**$5,135**).

•   The illegally-reimbursed campaign contributions that Haidl provided to defendant's campaign to get defendant elected Sheriff in 1998, with defendant's knowledge and consent (**$45,000**).[5]

•   The illegally paid-for in-kind campaign contributions by Haidl (or on Haidl's behalf) to defendant's 1998 election, with defendant's knowledge and consent (**$25,000**).[6]

---

[5]In addition to Haidl's testimony, Trial Exhibit 426 establishes approximately $45,000 in illegally-reimbursed campaign contributions provided to defendant by Haidl. The Court also heard testimony from other witnesses, including, but not limited to, Mark Dilullo, Peggy Haidl, Lisa Jaramillo, and Joseph Cavallo, regarding the defendant's receipt of illegally-reimbursed campaign contributions, and defendant's knowledge and participation in receiving these contributions.

[6]See Trial Exhibit 397 (Haidl's May 1998 credit card statement establishing over $2,000 in payments for purchases of banners for defendant's campaign); Bernard McKinley's trial testimony that he paid approximately $8,000 to $10,000 for banners, signs, and trucks in advertising for defendant's 1998 campaign; and trial testimony of both Mark Dilullo and Haidl establishing that Haidl paid approximately $15,000 to $20,000 for a plane to fly defendant's campaign banner during Memorial Day Weekend in 1998. These figures do not include the use of Haidl's yacht and the payments that Haidl made to have fundraising events for defendant at Haidl's home and yacht, regarding which this Court also heard testimony. The Probation Office states that

- The Initial JHA loan for $110,000 that Haidl fully-guaranteed at the request of defendant, for which Haidl needed to assume responsibility as the firm immediately defaulted on the loan (**$110,000**).[7]

- The additional $130,000 in payments Haidl made, at defendant's request and direction, in December 1999 to pay off the debts of JHA and the $65,000 in payments Haidl made to Hoffman from 1999-2000, as part of the JHA law firm buyout/legal referral agreement for which defendant negotiated on behalf of Hoffman (**$195,000**).[8]

- The custom-made suits and clothes for defendant for which Haidl paid Pratap Chugh/Peter Daniel (**$5,487**).[9]

- Gambling Chips in both Las Vegas and Lake Tahoe that Haidl provided to defendant (**$5,000**).[10]

---

"Haidl provided approximately $63,000 in illegally-reimbursed contributions and/or in-kind contributions," (PSR ¶ 19) which is not wrong, but only includes the illegally-reimbursed campaign contributions and the flying campaign banner.

[7]This does not include the $25,000 in interest payments that the bank required Haidl, as guarantor of the loan, to pay the bank when the firm defaulted on the loan.

[8]Haidl, Barbara Patison, George Feles, Lisa Jaramillo, and Joseph Cavallo all testified to some or all portions of the JHA law firm buyout agreement, the money associated with the agreement, and defendant's role negotiating the agreement on behalf of Hoffman.

[9]See trial testimony of Chugh/Daniel and Haidl and Trial Exhibits 103, 104, 125-130 (related invoices and checks).

[10]See trial testimony of Haidl, Lisa Jaramillo, and Mark Dilullo.

1      •   Defendant's flight to/from Las Vegas with Hoffman

2   ($1,657).[11]

3   Accordingly, the total value of the items defendant received

4   and/or solicited is at least $432,144.

5       Defendant will likely take the position -- as he already has

6   with the Probation Office -- that the Court should not include

7   illegal campaign contributions in the calculation of payments and

8   benefits defendant received.   Defendant's repeated attempts to

9   disregard these contributions should again be rejected.   In its

10  Order Granting In Part And Denying In Part Defendant's Motion to

11  Strike Portions Of [Then-Operative] Third Superceding Indictment,

12  this Court rejected defendant's attempt to strike the language in

13  the indictment regarding California campaign contribution laws.

14  (Docket Entry 349, Pp 2-3).   This Court stated:

15

16  _____

17      [11]This only includes the flight that defendant admitted on
    the August 13, 2007, recording was "a problem" (Trial Exhibit
18  350).   The Government has not included the value of the use of
    Haidl's plane and/or yacht; Haidl paying for an extended period
19  of time for nearly all of defendant's and defendant's family's
    expenses, including meals, entertainment, trips, and seats at
20  various events; and Haidl providing the false verification letter
    for Hoffman at defendant's request to lease a Mercedes-Benz.
21  Moreover, the Government has not included other items of benefit
    that other members of the conspiracy received, including: the
22  tax-payer funded jobs defendant provided to Jaramillo and
    Hoffman's husband at the OCSD; the payments and items of value
23  received by Jaramillo and Cavallo; the OCSD vehicle Haidl
    received; and the non-monetary benefits defendant bestowed upon
24  Jaramillo and Haidl, such as their badges and positions,
    defendant quashing investigations into their actions, and
25  defendant attempting to provide beneficial treatment to them and
    their family members.   Although the Government does not include
26  these items for purposes of calculating loss pursuant to Section
    2B1.1, the Government believes this Court should consider these
27  items pursuant to Section 3553(a).
28

19

> Defendant argues that [the campaign contribution law]
> paragraphs should be stricken because election fraud
> cannot serve as the basis for a federal honest services
> fraud charge.  The Court disagrees.  The paragraphs
> help to **describe the conspiracy, including the
> beginning and the purposes of it.  They are relevant to
> the charge of honest services fraud because they are
> acts in furtherance of the conspiracy and provide
> context for the conspiracy**."

Id. at 3 (emphasis added).

The Court's rationale for recognizing the illegal campaign contributions as part of the conspiracy applies to render these contributions proper for consideration at sentencing.  Moreover, the Court heard from defendant himself in the undercover recordings and, as several witnesses testified, defendant repeatedly stated that he could not have been elected Sheriff without Haidl.[12]  Haidl providing defendant with the illegal campaign contributions was the beginning of the benefits Haidl provided defendant in furtherance of their honest services fraud scheme.  See United States v. Kemp, 500 F.3d 257, 281-82 (3d Cir. 2007) (setting forth "stream-of-benefits" bribery theory of honest services fraud under which benefits are given to public official with intent to influence public official and to receive favorable decisions by public official, even if it's for an "as needed" basis).  As such, this Court should include the illegally-reimbursed campaign contributions and illegally-paid-for in-kind contributions in the total value of the items defendant received and/or solicited.

---

[12] See Trial Exhibits 320, 321, defendant declaring to Haidl: "if it weren't for you I wouldn't be the Sheriff of Orange County.  I -- it would never have happened Don."

20

1    In addition, defendant has claimed that the majority of the
2  payments and benefits the Probation Office includes in its
3  calculations, which are similarly included above, should not be
4  counted because the defendant claims there was no quid pro quo
5  for the alleged benefits.  (PSR ¶ 39).  Defendant's argument is
6  both factually and legally incorrect.  Factually, this Court can
7  easily determine that the facts at trial established that the
8  benefits that Haidl provided defendant (or to others at
9  defendant's direction), were part of a stream-of-benefits bribery
10  scheme.  This Court need not make such a finding to include these
11  benefits in defendant's sentencing calculation, however, because
12  legally no quid pro quo is required.

13    As the Ninth Circuit recently set forth, a public official
14  can be guilty of honest services fraud either by acceptance of a
15  bribe or by "non-disclosure of material information."  United
16  States v. Weyhrauch, 548 F.3d 1237, 1247 (9th Cir. 2008); see
17  also United States v. Kincaid-Chauncey, --- F.3d — , 2009 WL
18  415567, *14 (9th Cir. 2009) ("[W]e do not believe that a quid pro
19  quo should be required in all § 1346 prosecutions; in fact,
20  imposing a quid pro quo requirement on all § 1346 cases risks
21  being under-inclusive, because some honest services fraud, such
22  as the failure to disclose a conflict of interest where required,
23  may not confer a direct or easily demonstrated benefit.").
24  Moreover, Section 2C1.1(b)(2), by its very language, does not
25  limit the calculation to only benefits received as part of a quid
26  pro quo, as argued by defendant.  On the contrary, Section
27  2C1.1(b)(2) increases the offense level based on the loss table
28  based on "the value of the payment, the benefit received . . .,

the value of anything obtained or to be obtained by a public

official or others acting with a public official . . ."

Accordingly, this Court should increase defendant's offense level

by fourteen based on defendant receiving, obtaining, and

soliciting at least $432,144 in items of value.

   3.   The Offense Involved an Elected Public official or Any
        Public Official in a High-Level Decision-Making
        Position (§ 2C1.1(b)(3))

   Section 2C1.1(b)(3) of the Sentencing Guidelines requires a

four-level increase if "the offense involved an elected public

official or any public official in a high-level decision-making

[] position." USSG § 2C1.1(b)(3).  The Government agrees with

the Probation Office's inclusion of this enhancement.  Without

knowing that defendant utilized illegal campaign contributions,

the citizens of Orange County elected defendant as Sheriff in

June 1998.  Again, as defendant concealed from the public his

corrupt activities and actions, the citizens re-elected defendant

in 2002 and 2006.  Moreover, Application Note Four of Section

2C1.1 clearly provides for defendant qualifying as a public

official in a high-level decision-making position. USSG § 2C1.1,

App. Note 4 (defining "high-level decision making position" as

one with "authority to make decisions for, or on behalf of, a

government department, agency, or other government entity," which

includes "a law enforcement officer").

   4.   Defendant Was A Public Official Who Facilitated the
        Obtaining of A Government Identification Document (§
        2C1.1(b)(4)(C))

   Section 2C1.1(b)(4)(C) provides for a two-level increase

"[i]f the defendant was a public official who facilitated . . .

the obtaining of a government identification document."  USSG §

22

2C1.1(b)(4)(C).  Application Note One of Section 2C1.1 defines "Government identification document" as "a document made or issued by or under the authority of . . . a political subdivision of a State, which, when completed with the information concerning a particular individual, is of **a type intended or commonly accepted for the purpose of identification of individuals**."  USSG § 2C1.1(b)(4)(C) (emphasis added).  The Probation Office does not include this two-level adjustment; the Government, however, believes this adjustment is applicable.

    As this Court saw through the evidence at trial, defendant made Haidl the Assistant Sheriff of Orange County and bestowed upon Haidl full police powers under California Penal Code ("CPC") 830.1.[13]  Defendant provided Haidl with Assistant Sheriff badges (Trial Exhibits 427 & 428) and Identification Documents (Trial Exhibit 429) that defendant issued under the authority of the Orange County Sheriff's Department, through powers bestowed on the OCSD to provide police badges and identifications as a political subdivision of the Police Officers Standards and Training ("POST").  The information on these badges and identification cards, specifically the ones defendant issued to Haidl, is of a type intended and commonly accepted as identification of the individual, particularly to identify him as a police officer.  In addition, defendant provided Haidl's family

---

[13]See trial testimony of Haidl and retired Lieutenant Daryl Parker and Trial Exhibit 429 regarding Haidl's status as a fully-sworn police officer under CPC 830.1.  This Court also heard testimony that an individual needs over 600 hours of training to be qualified under CPC 830.1, which Haidl obviously did not have.

1    members, friends, and business associates reserve badges and
2    identification cards as well.

3        The Probation Office informed the Government that it did not
4    believe this adjustment applied based on language within
5    Amendment 666 of the Supplement to Appendix C of the Sentencing
6    Guidelines, specifically that the Amendment refers to immigration
7    and terrorism matters.  The Government respectfully disagrees.
8    The language referenced states:

9        A new specific offense characteristic has been added to
         §§2C1.1 and 2C1.2 that provides two additional offense
10       levels when **the offender is a public official whose
         position involves** the security of the borders of the
11       United States **or the integrity of the process for
         generating documents related to** naturalization, legal
12       entry, legal residence, **or other government
         identification documents.**  This specific offense
13       characteristic recognizes the extreme sensitivity of
         these positions in light of heightened threats from
14       international terrorism.

15   Amendment 666 to USSG (effective date Nov. 1, 2004) (emphasis
16   added).

17       The language of the Amendment is not exclusive to
18   immigration and terrorism matters, it merely references such
19   matters as part of the reasons for the Amendment.  This specific
20   offense characteristic is in the corruption section of the
21   Sentencing Guidelines, indicating that the Commission did not
22   intend it only for immigration and terrorism contexts; nor does
23   the plain language suggest such.  When reading the Amendment in
24   its disjunctive form, as written, the Amendment supports the
25   application of the two-point specific offense characteristic.

26       Specifically, defendant was a public official whose position
27   involved the integrity of the process for generating government
28   identification documents: police badges and identifications.  As

                                  24

the Ninth Circuit has stated, in the context of applying an abuse
of trust enhancement to a police officer: "A police officer knows
the power of [a] badge.  Symbolizing the power of the state, a
badge invests its possessor with control over people and access
to places." United States v. Foreman, 926 F.2d 792, 795 (9th
Cir. 1990).  Defendant knew the power of the badge.[14]  POST only
authorized defendant to issue fully-sworn police officer badges
and identification documents to those meeting the enumerated
qualifications and standards.  By issuing Haidl a fully-sworn
police officer badge and identification without such
qualifications, defendant violated the integrity of the process
for generating this type of government identification document.

In an unpublished decision, the Sixth Circuit has applied
Section 2C1.1(b)(4)(C) in a context supporting its application in
this case.  United States v. Jones, 260 Fed.Appx. 873, 2008 WL
215793 (6th Cir. 2008) (unpublished).  In Jones, the defendant

---

[14]In "The Golden Star: An Illustrated History of the Badges,
Patches, and Insignia of the Orange County Sheriff's Department"
(MT Publishing 2007), defendant wrote the Foreword Message
regarding the importance of the OCSD's badge, which included:

> [The OCSD badge] represents far more than can ever be
> described here. . .  Our badge has been worn by people
> who can only be described as heroes -- eight members of
> the department have paid the ultimate price in the line
> of duty while wearing it . . .  Our badge represents
> nothing less than the history and honor of the
> department itself. . . [The badge] will always stand as
> a symbol of the pride, dedication, and professionalism
> of the finest law enforcement officers in the nation --
> the men and women of the Orange County Sheriff's
> Department.

Id. (Attached -- Sentencing Exhibit 1).

25

was a licensing clerk at a Driver's License Center ("DLC") in Tennessee with responsibilities to administer driver's license tests.  Id. at 875.  Jones was convicted of being involved in a bribery scheme involving her work at the DLC, in which she accepted payments from the owner of a driving school to ensure students from the driving school would pass their licensing tests.  Id.  The Sixth Circuit upheld the district court's inclusion of the two-level enhancement for Jones being a public official who facilitated the obtaining of a government identification document, pursuant to Section 2C1.1(b)(4)(C).[15] There were no immigration or terrorism aspects involved in Jones, nor was there any discussion of such a requirement.  Based on the plain language of the specific offense characteristic, the commentary and the amendment relating to the enhancement, and the Jones case, the inclusion of this specific offense characteristic in this case is appropriate.[16]

**IV.**

**RESPONSE TO DEFENDANT'S ANTICIPATED CLAIMS**

Incorporated in the Probation Office's PSR and Recommendation Letter are defendant's arguments and claims for

---

[15]The Government also notes that the defendant in Jones, a low-level employee at a DLC who only accepted approximately $7,000 as part of her scheme, received a 60-month sentence, which the Sixth Circuit upheld as reasonable.  260 Fed.Appx. 876, 879.

[16]Should the Court conclude that any of the guideline adjustments requested by the Government do not apply, the Government respectfully requests an upward departure pursuant to Section 5K2.7 to account for those additional aggravating factors and to reach a total offense level of 30 which the Government believes contains a sentence within that range that is the minimum term required to satisfy 18 U.S.C. § 3553(a).

1  downward departures and variances and for defendant to receive a

2  non-custodial sentence.   The Probation Office found that

3  defendant's claims do not warrant a downward departure or

4  variance.   The Government concurs.[17]   Defendant's claims are

5  meritless and neither warrant sentencing guideline departures nor

6  a more lenient sentence.

7  A.   SUSCEPTIBILITY TO ABUSE IN PRISON

8       Defendant first claims that he should receive a downward

9  departure based on United States v. Koon, 518 U.S. 81 (1996),

10 because he believes he will suffer abuse in prison due to the

11 notoriety of this case and his former position in law

12 enforcement.   Recommendation Letter p. 5.   In Koon, the Supreme

13 Court held that a sentencing court may consider a factor for

14 departure if the Guidelines have not proscribed such factor and,

15 based on the particular case, whether the factor "takes the case

16 outside the heartland."   Id. at 109.   The Supreme Court held that

17 the district court did not abuse its discretion in considering

18 the defendants' fear of abuse in prison due to their law

19 enforcement positions and the notoriety of the officers in that

20 case -- the defendants were the officers convicted of assaulting

21 Rodney King.   Id. at 111-12.   Although this Court has the

22 discretion to consider such a claim, this Court should reject any

23 request to depart on these grounds.

24      Defendant will not be the first law enforcement officer or

25 public official the United States Bureau of Prisons ("BOP") has

26 _____

27       [17]The Probation Office, however, believes that these claims
   support a low-end of the advisory guideline recommendation.   For
28 reasons discussed below, the Government does not agree with this.

1   housed.  As the Probation Officer stated in its recommendation

2   letter, and the Government has confirmed with Eliezer Ben-Shmuel,

3   Supervisory Attorney with the BOP, the BOP has the capabilities

4   to accommodate defendant during a period of incarceration.[18]  The

5   Government concurs with the Probation Office's analysis that no

6   departure is warranted on this basis.  Recommendation Letter p.

7   5.

8       The Fifth Circuit upheld a district court's refusal to grant

9   a downward departure based on <u>Koon</u> for susceptibility to abuse in

10  prison for a former New Orleans police officer convicted of

11  robbery.  <u>United States v. Thames</u>, 214 F.3d 608, 613-14 (5th Cir.

12  2000).  The Court distinguished <u>Koon</u>, and stated "a defendant's

13  status as a law enforcement officer is often times more akin to

14  an aggravating as opposed to a mitigating sentencing factor, as

15  criminal conduct by a police officer constitutes an abuse of a

16  public position."  <u>Id.</u> at 614 (citation omitted).  That is the

17  case here.  Defendant should not receive a departure for the very

18  reason his actions are so condemnable: that he was a law

19  enforcement officer.

20

21

22       [18]Supervisory Attorney Ben-Shmuel has indicated that

23  defendant will likely be housed at a low-security camp facility, which has the least restrictive conditions, and that at such

24  facilities there are few incidents of assault as the other inmates do not want to risk their placement in such conditions

25  (i.e., if they violate any rules, they are transferred to higher level location with further restrictions on their liberty).  Any

26  concern over susceptibility to abuse is further mitigated by the fact that defendant was a law enforcement officer at the county,

27  not federal, level and did not personally arrest anyone with whom

28  the BOP would house him.

B.   DEFENDANT'S PUBLIC SERVICE

Defendant also claims his record of public service should warrant a departure or variance.  The Probation Officer correctly notes that defendant's public service can equally be an aggravating factor, rather than a mitigating factor, as defendant's "public service" was at the heart of his criminal actions.[19]  Recommendation Letter p. 5.  As this Court heard at trial, defendant oftentimes used the mantle of public service to promote himself or for improper purposes.  Defendant's corrupt actions as Sheriff offset any "public service" defendant performed, and therefore, defendant does not warrant any departure or variance on this basis.[20]

C.   REMEDY FOR AUGUST 13, 2007 RECORDING

Defendant has also argued that a departure or variance is warranted because the Government violated ethical rules in obtaining the August 13, 2007, recording.  Title 18, United States Code, Section 3553, however, outlines the factors this Court should consider when sentencing defendant.  These factors focus on the defendant and defendant's conduct, not the conduct

---

[19]The Government also concurs with the Probation Office's finding that defendant's "affiliation with committees and organizations is similar to other heads of law enforcement agencies."  Recommendation Letter p. 5.

[20]In rejecting a similar claim for departure or variance based on a defendant's public service -- serving on the LAPD for thirty years, Judge Fischer maintained: "[S]uffice it to say that the Court does not find that defendant's career justifies a downward variance.  Instead, the magnitude of his betrayal of the trust placed in him would justify an upward variance, as I said, if the Court had not otherwise imposed an upward departure." Arneson, CR 04-1046(E)-DSF, Sentencing Hearing, p. 36.

29

1  of the Government.   This Court already has ruled on defendant's

2  Rule 2-100 claim.   The Government respects this Court's ruling.

3  A sentencing departure or variance on this basis, however, would

4  not be appropriate for defendant.

5       In any event, defendant already received a remedy.   Over the

6  Government's objection, the Court determined that defendant could

7  play portions of the undercover tapes as a remedy to the Court's

8  prior ruling regarding the no-contact rule.   <u>See, e.g.</u>, Jury

9  Trial, Day 4, Volume I, at 256-61.[21]   In short, appropriate

10  remedies have been applied in response to this issue.   The

11  defendant's conduct, not the Government's, led to the jury's

12  guilty verdict.   There is no ground to depart from the Sentencing

13  Guidelines and reduce defendant's sentence based on this claimed

14  basis.   The Government, respectfully submits, that the Court

15  should follow the controlling language of Section 3553(a), which

16  properly focuses on defendant's conduct and characteristics, as

17  will be discussed below.

18  D.   DEFENDANT'S FAMILY SITUATION

19       For privacy reasons, the Government will not disclose the

20  basis in which defendant contends this Court should grant him a

21  departure or variance.   <u>See</u> PSR ¶ 67; Recommendation Letter at 5-

22  6.   For the reasons stated by the Probation Office, and the fact

23  that there is no evidence that defendant's presence outside of

24  custody is necessary at all, the Government agrees with the

25  Probation Office that defendant provides no basis for a departure

26  _____

27       [21]Moreover, defendant, through his counsel, already sought
    an additional remedy when he referred the matter to the
28  California State Bar.

1   or variance.   Recommendation Letter p. 6; <u>see</u> <u>also</u> USSG § 5H1.6

2   (noting that family circumstances do not ordinarily support

3   departure from the Guidelines); <u>United States v. Mondello</u>, 927

4   F.2d 1463, 1468-70 (9th Cir. 1991) (pre-<u>Booker</u>, holding that

5   family circumstances may serve as basis for departure only in

6   "extraordinary circumstances").

7                                   **v.**

8                       **RECOMMENDED SENTENCE**

9            "Protecting victims not coddling criminals"

10

11                              Sheriff-Candidate Mike Carona's
                                Point 7 of his Seven-Point Plan
                                during his 1998 Campaign for

12                              Sheriff -- Sentencing Exhibit 2.

13       Defendant now stands before this Court as a convicted felon

14  who victimized many by his selfish and criminal acts.   This

15  Court, in turn, should not "coddle" defendant, but should punish

16  him appropriately.

17       Defendant served as the Sheriff of Orange County for nine

18  years from January 1999 through January 2008.   As late as August

19  13, 2007, defendant attempted to convince Haidl to lie and

20  withhold testimony when defendant faced a federal grand jury

21  investigation into defendant's corrupt conduct beginning during

22  his 1998 campaign for Sheriff and through his time as Sheriff.

23  As a result, the Government respectfully submits that this Court

24  should sentence defendant to a term of 108 months imprisonment,

25  nine years.   This would constitute approximately the mid-point of

26  the applicable guideline range of 97-121 months.   Indeed, this

27  sentence is also commensurate to the time defendant held office,

28  sending a strong message of deterrence.   In addition, the

                                   31

Government recommends the Court order defendant to pay a fine of at least $125,000.[22] This sentence is the minimum sentence that is appropriate and reasonable in light of the statutory policy goals set forth in 18 U.S.C. § 3553(a).

In addition to the Sentencing Guideline calculations above, the Government believes other sentencing departures arguably are applicable. The Government does not submit that these departures are necessary, however, provides the following analysis to support a 108-month sentence.

---

[22]The Probation Office recommends a $65,000 fine, the approximate middle of the advisory guideline range for an offense level of twenty-eight pursuant to USSG Section 5E1.2(c)(3). The purpose of criminal fines is punitive, not remedial. Schachter v. C.I.R., 255 F.3d 1031, 1034-35 (9th Cir. 2001); USSG § 5E1.2(d) ("The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."). In the current case, defendant personally received at least $65,000 in improper benefits from Haidl alone, and the Court heard throughout the trial all of the items of value defendant and his family received.
According to the PSR, defendant is receiving approximately $185,000 per year in retirement pension, which both the Probation Office and County Counsel for the County of Orange have confirmed defendant will receive for the rest of his life and his criminal conviction will not affect it. Defendant claims he cannot pay a fine, but his financial disclosures in the PSR reveal a different picture. In addition, defendant has disclosed he received a legal defense fund, but has refused to provide an accounting or sources of such fund to the Probation Office, despite such requests. (PSR ¶ 102). Accordingly, although a $65,000 fine would serve a punitive purpose, the Government believes the fine should be at least $125,000, with defendant obligated to pay a portion immediately and the remainder over time, which shall bear interest as provided by law.

A.   AN UPWARD DEPARTURE FOR DISRUPTION OF GOVERNMENTAL FUNCTION
     UNDER USSG § 5K2.7

     The Government submits that this Court could impose an
upward departure to defendant's offense level for disruption of
governmental function pursuant to Section 5K2.7.  The Probation
Office does not believe a departure pursuant to Section 5K2.7 is
warranted, stating: "there is always shame when a member of the
law enforcement community is convicted and there is always
disruption when someone steps down from a position."  Probation
Office Recommendation Letter, disclosed Friday, March 20, 2009,
p. 5.  The Government respectfully disagrees.

     This is not simply a conviction of a "member" of law
enforcement.  Defendant was the highest ranking law enforcement
official in Orange County and a nationally-prominent law
enforcement figure, but is now a convicted felon.  And the OCSD
did not suffer disruption simply because the head of their
department "stepped down," the head of the department left amidst
felony charges directly related to defendant's obstruction of a
federal investigation and corrupt use of his office and position.

     Application Note Seven to Section 2C1.1 states in part:

     In a case in which the court finds that the defendant's
     conduct was part of a systematic or pervasive
     corruption of a governmental function, process, or
     office that may cause loss of public confidence in
     government, an upward departure may be warranted.  See
     §5K2.7 (Disruption of Governmental Function).

USSG § 2C1.1 Appl. Note 7.  Section 5K2.7 provides:

     If the defendant's conduct resulted in a significant
     disruption of a governmental function, the court may
     increase the sentence above the authorized guideline
     range to reflect the nature and extent of the
     disruption and the importance of the governmental

33

function affected. Departure from the guidelines
ordinarily would not be justified when the offense of
conviction is an offense such as bribery or obstruction
of justice; in such cases interference with a
governmental function is inherent in the offense, and
unless the circumstances are unusual the guidelines
will reflect the appropriate punishment for such
interference.

USSG § 5K2.7.

In United States v. Walker, 21 F.Supp.2d 1288 (N.D. Okla

1997), the District Court weighed the circumstances and rationale

surrounding Section 5K2.7 and applied the upward departure to the

elected Sheriff of Ottawa County, Oklahoma, who pleaded guilty to

aiding and abetting an illegal gambling ring.  Id. at 1289-90,

1293-94, affirmed United States v. Walker, 153 F.3d 729 (10th

Cir. 1998) (unpublished) (upholding the district court's sentence

and imposition of the Section 5K2.7 enhancement due to

defendant's actions leading to a loss of public confidence and

due to defendant's violation of his oath of office).  In imposing

the enhancement, the Honorable United States District Court Judge

Sven Erik Holmes stated:

> Our system of law cannot function without the
> confidence of the people.  A primary responsibility of
> all public officials is to enhance confidence in our
> government.  Citizens have a right to expect strict
> compliance with the law by elected law enforcement
> officials.  All law enforcement officials have an
> obligation to support and promote the rule of law.  Law
> enforcement officials must evidence respect for the law
> if society is to expect those subject to their actions
> to respect the law as well.  An officer who causes
> people to question the integrity and impartiality of
> law enforcement undermines the rule of law and disrupts
> the functioning of all aspects of law enforcement in
> both the executive and judicial branches of government.
> Confidence in our legal system is undermined when those
> who are charged with enforcing the law choose to break
> the law instead.  If a public official's actions cause
> the people of Ottawa County, and elsewhere, to doubt
> the commitment to even-handed law enforcement by the

34

1  Sheriff's office, then that public official has
   significantly disrupted a governmental function.  The
2  Court concludes that section 5K2.7 encompasses this
   loss of confidence in government . . .  The Court finds
3  that Defendant evidenced a total disregard for his oath
   of office.  His actions undermined public confidence in
4  government in general and law enforcement in
   particular.  This erosion of public confidence in
5  government occasioned by Defendant's conduct amounts to
   a disruption of a governmental function as contemplated
6  by the sentencing guidelines.

7  Walker, 21 F.Supp.2d at 1293-1294; see also United States v.

8  Paulus, 419 F.3d 693, 700 (7th Cir. 2005) (affirming a fifty-

9  eight month sentence that imposed an upward departure pursuant to

10 Section 5K2.7 to defendant, an elected District Attorney in

11 Wisconsin, who pled guilty); United States v. Gundy, 112 F.3d

12 1493, 1502-03 (11th Cir. 1997) (affirming a forty-one month

13 sentence with an enhancement pursuant to Section 5K2.7 for

14 causing a loss of public faith in the court system and

15 significantly disrupting governmental function by defendant, a

16 municipal court judge who pled guilty).

17     Similarly, the Honorable United States District Court Judge

18 Dale S. Fischer recently departed upward based on the Section

19 2C1.1 Application Note on a defendant, a sergeant in the LAPD,

20 where defendant's conduct was part of a systematic or pervasive

21 corruption of governmental function. United States v. Mark

22 Arneson, CR 04-1046(E)-DSF, Sentencing Hearing, March 3, 2009, p.

23 29.  The Honorable Judge Fischer stated:

24  While [defendant] should have been serving the public,
    . . . he repeatedly and remorselessly abused his
25  position of trust . . . and otherwise betrayed the
    trust the public places in anyone in such position.
26  Whenever a public official is found to have betrayed
    the public's trust, it casts down on other dedicated,
27  hard-working, honest, and loyal officials.  That
    defendant survived so long and reached the rank of
28  sergeant only serves to increase the harm to the

35

> reputation of the LAPD and its officers and to cause a
> loss of public confidence in the integrity of that
> organization and its members. . . . The Court agrees with
> the Government's analysis that the Guidelines range, in
> the absence of upward departures, fails to account for
> the . . . sheer magnitude of the betrayal of the legal
> system that defendant has purported to serve and the
> law he has sworn to uphold.

Id. at 29-30.

The Probation Office notes that "[t]he victims are the citizens of Orange County and the general public." (PSR ¶ 27). The Government concurs. In addition, our entire criminal justice system is premised on the belief that the public -- and the judicial system which relies heavily on truthful statements of law enforcement -- can trust that the actions and statements of law enforcement officers are truthful, legal, and ethical. In this case, defendant was not merely a law enforcement officer, he was the highest-ranking law enforcement officer in Orange County, entrusted to oversee the sixth largest Sheriff's Department in the nation, with a budget of over $500 million per year.

Law enforcement officers and elected officials represent the interests of our community. The integrity of the criminal justice system is inextricably intertwined with the integrity of our law enforcement officials. Defendant claimed in his 1998 campaign for Sheriff that he would do the job of Sheriff "with Leadership, Experience, and Integrity." (Attached -- Sentencing Exhibit 2). As this Court heard at trial, defendant's "leadership" as Sheriff was self-serving and included his co-conspirators, regardless of experience. When defendant became Sheriff, the department was run by defendant, Jaramillo -- who was a Lieutenant with the Garden Grove Police Department for one

day pursuant to a lawsuit settlement, and Haidl -- whose primary

experience in law enforcement was through fundraising.  Moreover,

this Court heard numerous witnesses describe how defendant used

Jaramillo as the "front-man" or "buffer" on most matters.  The

"leadership" of the OCSD under defendant, which included

defendant, Jaramillo, and Haidl, are all now convicted felons.

Defendant violated the integrity of the office.

Integrity is determined by what one does when nobody is

watching.  But this Court heard defendant in the undercover

recordings when he did not believe anyone was watching;

defendant's lack of integrity is shockingly and disturbingly

apparent.  In so easily shedding his supposed integrity,

defendant did damage to all members of law enforcement, which is,

and should be, among the most honorable professions.

Defendant's conduct unfortunately has had a broad and

deleterious impact on the honorable men and women in law

enforcement who selflessly give to the community, as defendant's

actions marred both law enforcement and public officials in the

eyes of the public.  The attached letter dated April 7, 2009,

from Wayne J. Quint, Jr., the President of the Association of

Orange County Deputy Sheriffs ("AOCDS"), who represents over 1800

OCSD sergeants, investigators, and deputy sheriffs, among others,

provides this Court a direct example of how defendant victimized

the entire law enforcement community and the criminal justice

system, and specifically the OCSD.  <u>See</u> Attached -- Sentencing

Exhibit 3.  The Letter states, in part:

> On November 6, 2007, AOCDS communicated to our
> members, the public and the press that *Sheriff Carona's
> serious legal issues have become a growing distraction*

37

*to the day to day operation of the Department.* **His issues have caused erosion in the public's confidence in our ability to provide services to the citizens of Orange County** (see attached Press Release, November 6, 2007). **That press release was then, and sadly is still today, factual.**

. . .

Because former Sheriff Carona was the first indicted sheriff in the then 118-year history of the Sheriff's Department, **my members were subject to daily negative comments from the public, other law enforcement agency members and inmates confined to the department's five custody/correction facilities.  These comments had a horrible impact on the morale of the men and women who provided services to the citizens of Orange County.** As a 27-year member of Orange County law enforcement, I can say without exception that morale reached an all-time low from the time of the indictment until June of 2008 when a new sheriff was appointed by the Orange County Board of Supervisors.

Although a new sheriff is in office, former Sheriff Carona's legal issues continue to weigh upon the rank and file members of our association.  **The department has lost credibility with other law enforcement agencies as a direct result of his conviction.** . .

In closing, the mission statement of the Orange County Sheriff's Department in part reads, *"We will strive to be leaders and a national model in all aspects of law enforcement, homeland security and jail operations."* **The overwhelming communications that I have received from my membership are very clear that former Sheriff Carona is responsible for seriously weakening the foundation of the Orange County Sheriff's Department that thousands of present and past deputy sheriffs worked so hard to build.**

<u>Id.</u> (*italics* in original; emphasis in **bold** added).

Defendant's conduct in this case clearly was "part of a systematic or pervasive corruption of a governmental function, process, or office that may cause loss of public confidence in government."  USSG § 2C1.1 Appl. Note 7.  Defendant's corrupt conduct -- all while he was a public official -- spanned from at least 1998 through at least August 13, 2007.  Defendant appointed Haidl and Jaramillo as Assistant Sheriffs, the second highest position in the OCSD, to facilitate their use of the OCSD for

38

1    corrupt purposes.   Defendant's pattern of conduct included:
2    defendant receiving cash bribes from Haidl for nearly four years;
3    defendant making Haidl a fully-sworn police officer without the
4    qualifications; defendant providing tax-payer funded jobs to
5    Jaramillo and Hoffman's husband; and defendant using his
6    influence as Sheriff to get Hoffman appointed to a state board to
7    facilitate them traveling together to carry out their affair.
8         Perhaps one of the worst examples of defendant's pattern of
9    corrupt conduct, as this Court heard at trial, was defendant's
10   decision to take advantage of the death of a deputy within the
11   OCSD and use his position and influence as Sheriff to benefit and
12   enrich himself, Haidl, Cavallo, Hoffman, and Jaramillo.   Within
13   hours of the death of Deputy Brad Warner, defendant approached
14   the Deputy's widow with Cavallo at his side.   And during the
15   widow's most fragile emotional state, defendant introduced the
16   widow to Cavallo in order for the widow to hire Cavallo as part
17   of defendant and the other individuals' legal-referral agreement.
18   Although defendant made it appear the Sheriff was helping the
19   grieving widow of a deputy, he actually was attempting to use his
20   power and influence to enrich and benefit himself and others in
21   his inner circle.   Defendant's conduct, as this Court heard
22   throughout the trial, was systematic and pervasive.   Although
23   this Court could properly enhance defendant's sentence pursuant
24   to Section 5K2.7, the Government believes in light of the all of
25   the Section 3553(a) factors, a sentence of 108 months is
26   appropriate as discussed below.
27
28

B.   OTHER RELEVANT ADJUSTMENTS

     1.   Role in the Offense

     Section 3B1.1 of the Sentencing Guidelines provides for a
range of enhancements, from two-to-four levels to the offense
level, for defendants who play an aggravating role in the
offense.   Section 3B1.1(c), the minimal enhancement for
aggravating role, imposes a two-level enhancement if the
defendant was an organizer, leader, manager or supervisor in any
criminal activity that did not involve five or more participants
or was not otherwise extensive.   The Probation Office concludes
that no adjustment for role in the offense is appropriate as "the
defendants are seen as essentially equal in culpability[,] each
played a mutually supportive role, and each defendant's
participation was integral to the completion of the offense."
(PSR ¶ 43).   At a minimum, regarding the obstruction conviction,
and defendant's actions to set up the meetings with Haidl, this
Court heard that defendant used his wife and Peggy Haidl to
coordinate communications and the arrangements for the meetings.
Moreover, this Court heard defendant on August 13, 2007,
repeatedly telling Haidl what Haidl needed to do, directing
Haidl.   Although the Government believes a role enhancement could
apply, the Government does not argue that one is necessary, but
provides the analysis as it is relevant to the Government's
sentencing recommendation.

     2.   Abuse of a Position of Trust

     Section 3B1.3 requires a two-level enhancement "[i]f the
defendant abused a position of public or private trust, or used a
special skill, in a manner that significantly facilitated the

40

commission or concealment of the offense." USSG § 3B1.3. The
guidelines contemplate that individuals who abuse their positions
of trust to facilitate the commission or concealment of a crime
"generally are viewed as more culpable." Id., comment.
(backg'd.). Application Note Six to Section 2C1.1 provides that
this enhancement is inapplicable when determining a sentence
under Section 2C1.1. The Government provides the following
analysis as it is relevant to this Court's sentencing
determination.

In Foreman, the Ninth Circuit, in applying the abuse of
trust enhancement, asserted:

> [P]olice officers are accorded public trust to enforce
> the law. The public, including fellow law enforcement
> agents, expect that police officers will not violate
> the laws they are charged with enforcing. [Defendant]
> took advantage of that trust to make it easier for her
> to conceal criminal activity. We believe that this is
> precisely the type of situation contemplated by § 3B1.3
> as an abuse of position of public trust.

926 F.2d at 796; see also United States v. White, 270 F.3d 356,
371 (6th Cir. 2001) (holding that the general public may be
victims of a government employee's crimes for purposes of
enhancing a public official's sentence pursuant to Section
3B1.3); United States v. Sierra, 188 F.3d 798, 803 (7th Cir.
1999) (enhancing a police officer's sentence pursuant to abuse of
public trust "to deter those in positions of trust from
committing crimes in which the entrustment of power increases the
probability of success or concealment").

This Court saw defendant take his oath of office on January
4, 1999. As discussed above, defendant violated and failed to
carry out his sworn duty to "well and faithfully discharge the

41

1    duties" of the Office of Sheriff of Orange County.  Defendant's
2    conduct related to the count of conviction, obstructing justice,
3    strikes directly against the oath defendant swore to uphold.

4         This is not a case of a defendant who committed a crime
5    unrelated to the fact he was a law enforcement officer.  To the
6    contrary, this case involves a defendant whose criminal
7    activities were directly intertwined with and inextricable from
8    his position as Sheriff of Orange County.  It was in defendant's
9    capacity as candidate for the Sheriff of Orange County that he
10   met Jaramillo and Haidl and then personally swore Jaramillo and
11   Haidl into the positions of Assistant Sheriffs of the OCSD.
12   Defendant, as Sheriff of Orange County, accepted regular cash
13   payments, steered loans and payments to individuals, and covered-
14   up nefarious actions of co-conspirators.  Defendant, as Sheriff
15   of Orange County, spent over three hours on August 13, 2007,
16   going over his plan with Haidl to obstruct justice.  Thus,
17   defendant's position of trust not only "significantly
18   facilitated" the commission of his offense:  the offense would
19   never have occurred but for his position.  Defendant's abuse of
20   his position of public trust is a central fact this Court should
21   consider as it determines defendant's sentence.

22        3.  <u>Adjustment for Obstruction of Justice</u>

23        Section 3C1.1 instructs the court to impose a two-level
24   enhancement if the defendant obstructed or impeded the
25   administration of justice.  USSG § 3C1.1.  The Application Notes
26   both in Sections 2J1.2 and 3C1.1 states that this obstruction
27   enhancement does not apply to defendants who are convicted of

28

                                  42

offenses covered by 2J1.2, unless defendant committed significant
further obstruction during the investigation.

This Court heard Haidl's testimony that defendant's attempt
on August 13, 2007, to persuade Haidl to lie and withhold
testimony from the federal grand jury was not defendant's only
attempts to impede and obstruct the federal grand jury
investigation. Haidl testified that defendant was attempting to
obstruct the investigation dating back to March 2004, after
defendant fired Jaramillo and Jaramillo began cooperating with
the federal investigation. Haidl further testified that after
defendant learned Hoffman met with and provided information to
investigators, defendant both met with Haidl and Hoffman
separately to make sure their stories were straight and to ensure
that Hoffman would no longer cooperate with the investigation.
The Court also heard Barbara Patison and Peggy Haidl's testimony
that defendant approached them and made statements that these
witnesses took as implied threats not to cooperate with the
federal investigation.

Moreover, this Court heard hours of testimony from Haidl,
Sandy Trujillo-Murphy, Lisa Jaramillo, among others, regarding
defendant's willingness to subvert judicial proceedings and
internal investigations in which truthfulness is of paramount
importance, including, but not limited to: the incident involving
the alleged interference by Jaramillo in San Bernadino regarding
Greg Haidl's sexual assault investigation; the investigation of
Jaramillo's sexual harassment of Sandy Trujillo; and the Orange
County District Attorney's investigation of Jaramillo. Witnesses
detailed defendant's desire to lie, convince others to lie, and

1  to get stories straight, all for the benefit of defendant or a

2  co-conspirator -- which also benefitted defendant if he could

3  prevent one of his co-conspirators from being exposed for their

4  actions.[23]   Again, the Government is not seeking an obstruction

5  of justice enhancement, however, the Government provides the

6  analysis as it is relevant to a sentencing recommendation.

7  C.   A 108-MONTH SENTENCE IS APPROPRIATE

8       The law provides that sentencing courts must start with the

9  sentence advised by the Sentencing Guidelines.   United States v.

10 Booker, 543 U.S. 220, 264 (2005) ("The district courts, while not

11 bound to apply the Guidelines, must consult those Guidelines and

12 take them into account when sentencing."); United States v.

13 Cantrell, 433 F.3d 1269, 1279 (9th Cir. 2006) (stressing that

14 "district courts still must consult the Guidelines and take them

15 into account when sentencing, even though they now have the

16 discretion to impose non-Guidelines sentences").   Thus, the

17 "starting point" here in determining the appropriate sentence is

18 the advisory guideline range of 97-121 months of incarceration.

19 See Cantrell, 433 F.3d at 1280.

20

21

22      [23]For example, this Court heard the testimony of Captain

23 Davis Nighswonger, head of the OCSD Professional Standards
   Division, retired Police Chief of Newport Beach Bob McDonell, and

24 Haidl regarding the formal letter from Chief McDonell detailing
   serious allegations of misconduct by at least George Jaramillo as

25 it related to Newport Beach Police Department's investigation
   into the Greg Haidl sexual assault case.   The testimony was clear

26 that the letter was formal, the OCSD should have opened an
   investigation into the matter, and defendant dismissed the

27 allegation without any such investigation, to protect Jaramillo

28 and Haidl.

Pursuant to 18 U.S.C. § 3553(a), the court should "impose a sentence sufficient, but not greater than necessary," to comply with the enumerated purposes of sentencing, including:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>      (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>      (B) to afford adequate deterrence to criminal conduct;
>      (C) to protect the public from further crimes of the defendant; and
>      (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(1), (2).  The Government submits that a mid-guideline sentence of 108 months is fully appropriate and consistent with the goals of sentencing set forth in 18 U.S.C. § 3553(a), in particular: the need for specific and general deterrence; the need for the sentence to reflect the seriousness of defendant's crimes; the need to promote respect for the law; and the need to provide just punishment.

1.   <u>Nature and Circumstances of the Offense</u>

Defendant, the three-time elected Sheriff of Orange County and nationally-prominent public official, stands convicted of witness tampering and obstruction of justice.  There is little more that the Government can say about the nature of defendant's conduct that this Court did not already see and hear during the approximately eight weeks of trial.

2.   <u>History And Characteristics Of Defendant</u>

The PSR makes clear that defendant had numerous benefits, opportunities, and advantages, including love and support of

1    family and friends, educational opportunities (defendant has two
2    masters degrees), that are unavailable to the great majority of
3    defendants before this Court.   The report goes into great detail
4    regarding defendant's intellect, accomplishments, and prestigious
5    appointments.   Although defendant's abilities and accomplishments
6    may be compelling, what is also abundantly clear is defendant did
7    not need to do what he did.   Defendant was not driven to his
8    crimes as many defendants who come before this Court are: by
9    need, by desperation, or by the inability to do anything else.
10   Defendant's criminal conduct arose from rational deliberation and
11   calculated choice; defendant committed his crimes because he
12   wanted to, not because he had to commit them.

13       Although the letters submitted on defendant's behalf to the
14   Probation Office from his friends and family presumably describe
15   his "devotion to helping children, dedication to the community,
16   and years of public service," (PSR ¶ 71) the Government
17   respectfully submits that the offense conduct in this case cannot
18   rationally be viewed as aberrant.   Defendant did not decide on
19   August 13, 2007, after approximately thirty years in law
20   enforcement, to attempt to obstruct justice and convince another
21   individual to lie.   Defendant's pattern of conduct of seeking
22   corruptly to obtain personal benefit at the sake of public trust,
23   dates back at least a decade.

24       For example, this Court heard defendant, in his own words,
25   bragging that since becoming Sheriff, he had "met millionaires,
26   billionaires and [] traveled on personal airplanes and . . .
27   drank great wine and you know, had great booze and had some you
28   know phenomenal pussy."   (Attached -- Sentencing Exhibit 4).

1    Defendant enjoyed his undeserved power and boasted as Sheriff
2    he's the "most lethal mother fucker in politics in Orange County"
3    and "the most dangerous elected official in Orange County, 'cause
4    I don't give a fuck."  Trial Exhibits 302, 340.  This Court also
5    heard, repeatedly, over a three-hour conversation on August 13,
6    2007, defendant's countless attempts to convince Haidl to lie for
7    defendant and to conceal the truth from a federal grand jury.
8    For example, this Court heard as defendant described the
9    differences between a state and federal grand jury investigation
10   and how it would be easier for defendant and Haidl to present a
11   false story to a federal grand jury.  See Trial Exhibits 378,
12   380.  Defendant's conduct was willful and deliberate.

13        This Court also heard, during this three hour meeting, Haidl
14   repeatedly discussing with defendant the criminal activities the
15   two men engaged in together and Haidl continually asserting he
16   would lie and commit perjury for defendant.  At no point during
17   the meeting did defendant ask what Haidl was talking about,
18   contradict Haidl, refuse to be a party to such a crime, or leave
19   the table.  Defendant, the Sheriff of Orange County, sworn to
20   uphold the laws and Constitution of the United States and the
21   State of California, stayed, participated, and engaged Haidl in
22   an attempt to continue to conceal his criminal behavior.  Indeed,
23   the only concern expressed by defendant throughout the undercover
24   recordings are the witnesses he could not control and the

25

26

27

28

evidence for which he would not be able to create a cover story.[24]

Defendant has rejected numerous opportunities in this matter to accept responsibility for his conduct and get himself back on the right side of the law.  Even after the jury's verdicts, defendant has refused to accept responsibility or express any regret for his actions.  After the verdicts, in which defendant became a convicted felon, defendant proclaimed his "innocence," stated that the verdict was an "absolute miracle," and asserted he was "beyond vindicated."  To date, defendant continues to fail to demonstrate even a modicum of remorse for his actions or any acceptance of responsibility for his criminal conduct.  Despite defendant's background and accomplishments, in the end, defendant is just another criminal who thinks that the law is something that applies to other people.

    3.   <u>Need For The Sentence to Reflect the Seriousness of the Offense, to Promote Respect For the Law, and to Provide Just Punishment For the Offense</u>

The Government submits that its recommended sentence of 108 months imprisonment is required to reflect the seriousness of defendant's crimes, to promote respect for the law, and to provide just punishment.  Defendant, the elected Sheriff of Orange County, took an oath to uphold and faithfully execute the law.  As the undercover tapes and other evidence make clear, defendant violated his sworn oath as late as August 13, 2007,

---

[24]<u>See, e.g.</u>, Trial Exhibit 356 (defendant believing Ed Grech might be a problem because defendant no longer talks to Grech and Grech is friendly with the Jaramillos); Trial Exhibit 364 (defendant believing he and Haidl might have a problem lying about flights because they may be documented in flight logs).

when he knowingly and willfully attempted to get Haidl to lie and
withhold information from a federal grand jury.  As detailed
above, primarily in the Section 5K2.7 discussion, the seriousness
of defendant's criminal conduct cannot be overstated.  The
seriousness of defendant's criminal conduct, the need to promote
respect for the law and its institutions, and to punish defendant
for his outrageous conduct, require this Court to impose a
significant sentence.

      4.   <u>Need For the Sentence to Afford Adequate Deterrence</u>

     The need for the sentence imposed to afford general
deterrence (and, in light of defendant's continued failure to
accept any responsibility or express any remorse, specific
deterrence) is strong.  Defendant must receive appropriate and
just punishment as a deterrent to others from even considering
engaging in similar criminal conduct, to send a message that this
behavior is unacceptable, and to preserve respect for the law and
our system of justice.

    A substantial prison sentence is required to deter other
public officials and law enforcement officials who, like
defendant, would misuse their sworn positions of trust and
violate the law to benefit themselves.  Those that sit in
positions of public trust should not be emboldened by defendant's
public refusal to accept responsibility for his conduct for which
he stands a convicted felon, or by a lenient sentence.  The
cogent statement recently made by the Honorable Judge Fischer
while sentencing a prominent attorney, Terry Christensen, about
the need for a significant sentence to deter other attorneys from
similar criminal conduct applies with equal force in this case as

49

1  to other public officials: "[defendant] is not the first, and

2  unfortunately won't be the last, to be tempted to engage in

3  illegal or unethical conduct.  Only a significant custodial

4  sentence will send the appropriate message to those considering

5  the possibility of misusing their positions in the future."

6  United States v. Terry Christensen, CR 04-1046(E)-DSF, Sentencing

7  Hearing, Nov. 24, 2008, p. 57.

8          5.   Need For the Sentence to Protect the Public

9          The Government contends that a significant sentence is

10 needed to protect the public from further criminal conduct by

11 defendant.  Despite having had several years to reflect on his

12 offenses, defendant refuses to express even the slightest remorse

13 for his conduct, for the harm caused to the public, or for the

14 harm and embarrassment that he has caused to the Orange County

15 Sheriff's Department and to the law enforcement profession as a

16 whole.  Any claim that defendant has been rehabilitated is belied

17 by the fact that, to date, he has not expressed any acceptance of

18 responsibility for his criminal acts.  Defendant has given this

19 Court no reason to believe that he would hesitate to do precisely

20 the same thing again (or other criminal conduct) if he thought he

21 could get away with it.

22         Defendant caused substantial harm to the community and to

23 the criminal laws that he swore to uphold.  He is, in the

24 Government's view, undeserving of the leniency he requests, and

25 he should receive a sentence that reflects appropriate punishment

26 for and deterrence from his conduct.  The Government respectfully

27 asserts that a guideline sentence of 108 months incarceration is

28 both reasonable and appropriate in this case, and is sufficient,

1  but not greater than necessary, to achieve the goals of 18 U.S.C.

2  § 3553(a).

3                                **VI.**

4                           **CONCLUSION**

5       For all of the reasons stated above, the Government

6  respectfully requests that defendant be sentenced to a term of

7  imprisonment of 108 months and a fine of at least $125,000.

8

9                              Respectfully submitted,

10                             THOMAS P. O'BRIEN
                               United States Attorney
11
                               ROBB C. ADKINS
12                             Assistant United States Attorney
                               Chief, Southern Division
13

14                              *Brett A. Sagel*

15  Date: 04/10/09             BRETT A. SAGEL
                               KENNETH B. JULIAN
16                             Assistant United States Attorneys
                                    Attorneys for Plaintiff
17                                  United States of America

18

19

20

21

22

23

24

25

26

27

28